OPINION
Defendant-appellant, Jerome Tatum, appeals from a judgment of the Franklin County Court of Common Pleas. In May 1998, the Franklin County Grand Jury indicted appellant on several crimes relating to the death of Mamadou Ndiath. Specifically, appellant was indicted on three counts of aggravated murder with firearm specifications, in violation of R.C.2903.01; one count of aggravated robbery with a firearm specification, in violation of R.C. 2911.01; one count of kidnapping with a firearm specification, in violation of R.C. 2905.01; and one count of burglary, in violation of R.C. 2911.12, which involved appellant's entry into Jason Thomas' apartment unit. Appellant was further indicted on two counts of receiving stolen property, in violation of R.C. 2913.51. One of the receiving stolen property counts involved appellant unlawfully taking from Thomas the gun used in Ndiath's death. The other count involved appellant taking jewelry and electronic items from Thomas. Finally, appellant was indicted on one count of carrying a concealed weapon, in violation of R.C. 2923.12, and one count of having a weapon while under disability, in violation of R.C. 2923.13.
Appellant pled not guilty to the above charges. He waived his right to a jury trial on the charge of having a weapon while under disability. A jury trial commenced on all other charges.
At trial, Columbus Police Officer Steve Heddleson testified that, on May 12, 1998, he went to a parking lot near 1975 Winslow Drive of the Cambridge Park Apartments after receiving information that a man, later identified as Ndiath, had been shot. Upon arriving at the scene, Officer Heddleson found a cab with Ndiath's body lying "half in and half out" of the rear door on the driver's side. Ndiath's upper body was lying out of the cab, his head was on the ground, and there was a pool of blood under his head.
Columbus Police Officer Thomas Seevers assisted in the investigation of Ndiath's death. Officer Seevers collected two Winchester nine-millimeter spent shell casings, which were found outside the cab, and described photographs of the scene, including those demonstrating that the cab was parked at the back part of the apartment complex near a wooded area.
Columbus Detective Edward Kallay was also involved in the investigation of Ndiath's death. The detective found blood on the rear driver's side door, and a bullet hole in Ndiath's shirt, located "almost in the center of the back of the collar."
Deputy Coroner Patrick Fardal surmised that Ndiath was fired upon twice. One shot was fired at his right leg and the fatal shot was located at the back of Ndiath's neck.
Fourteen-year-old Brandon Dudley testified that he was living on Winslow Drive in May 1998, and was home on the day Ndiath was shot. Dudley first became aware of the cab when he heard the driver honking the cab's horn. When Dudley heard the horn, he went to the window facing the parking lot. Dudley saw the cab driver and some movement in the back seat. Dudley looked out the window for two or three seconds and then went back to the front room of his apartment. Dudley next testified:
 * * * I heard a semi go past and it backfired, and I thought it backfired. Then after I really thought about it I went back to the cab driver, back to the window and I looked out the window, and I seen the man dead.
Shortly thereafter, appellant came to Dudley's door. According to Dudley, appellant had a normal and calm demeanor. Dudley let appellant into the apartment after he asked to use the phone. Appellant then asked Dudley to walk downstairs with him. Dudley proceeded to follow appellant until he saw that he was carrying "something heavy in his back pocket." Dudley ran back to his apartment and locked the door. Appellant began knocking on the door, saying that "his cab driver was out here." Dudley did not respond, but, instead, called the police.
Michael Wright testified that he is the operations manager for the cab company associated with Ndiath. He confirmed that Ndiath's cab was dispatched to the Cambridge Park Apartments. Wright saw Ndiath's cab the day before the shooting and said that the cab's appearance was neat and clean, and in conformance with the way Ndiath normally kept it. Wright further described Ndiath as being a "very gentle person, nonaggressive, nice guy" who spoke both English, with an accent, and French.
The next person to testify on behalf of plaintiff-appellee, the state of Ohio, was Tennell Griffin, an acquaintance of appellant. Griffin was living in the Cambridge Park Apartments on May 12, 1998. According to Griffin, appellant came to her apartment around the early afternoon of May 12. While appellant was visiting Griffin, he showed her a gun. Griffin had just seen the cab outside her apartment and asked appellant if he committed the crime against the cab driver. Appellant stated, "[w]hy am I going to go around robbing people?" Appellant then told Griffin he was going to tell people he was with her all day and then left the apartment.
Columbus Police Officer Patrick Brooks testified that he and Officer Bolt encountered appellant on the evening of May 12, 1998. The officers saw appellant riding a bicycle at night without a headlight, in violation of pertinent traffic laws. The officers attempted to initiate a traffic stop, but appellant fled. While pursuing appellant, the officers noticed that a gun fell out of appellant's pocket. Officers Bolt and Brooks eventually captured appellant while he was hiding underneath a car. At trial, Officer Brooks was shown appellee's Exhibit 9A, a nine-millimeter gun, and identified the gun as the weapon appellant had concealed.
Appellee called appellant's former girlfriend, Rosa Sunderland, to testify at trial. Sunderland was dating appellant in May 1998. According to Sunderland, appellant called her from jail on May 13, 1998, wanting her to tell the police that she was with appellant during the time Ndiath was murdered. Subsequently, Sunderland went to the police station to provide the alibi; however, she quickly admitted that the story was false after being probed by the police. Sunderland testified that appellant again asked her to provide a false alibi when she visited him in jail prior to his trial.
Appellant and appellee stipulated that the phone call requesting a cab came from a phone number registered to 2076 Winslow Drive, Apartment 5. The parties also stipulated that appellant's fingerprints were found in Apartment 5. Joshlin Hill testified that she lived at 2076 Winslow Drive, Apartment 5, in May 1998. Hill knew appellant and testified that, on the morning of May 12, appellant showed her a gun. According to Hill, appellant told her that he stole the gun from "some white boy" who lived in the Cambridge Park Apartments.
Jason Thomas testified that he lived at 2191 Winslow Drive, Apartment 10, at Cambridge Park Apartments. His apartment was burglarized on April 30, 1998. According to Thomas, the burglar took his nine-millimeter gun, along with four clips of ammunition. Thomas identified appellee's Exhibit 9A as his gun.
Appellant testified at trial that he stole the gun that was found on him when he was arrested and indicated that he took it from "somebody's apartment." Appellant also admitted to engaging in a series of break-ins at the apartment complex to support himself.
Next, appellant admitted to calling for a cab. According to appellant, he and a woman named Lynell were going to the shopping mall. Appellant testified that he instructed the cab driver to go to the back of the complex "to pick up a woman." Appellant also stated that he asked the cab driver to honk the horn a few times. Appellant testified that he then got out of the back seat and the driver got out of the front seat. Immediately thereafter, according to appellant, the gun he was carrying fell out of his waistband. Appellant explained that he was carrying a gun for self-protection due to his being a drug dealer. According to appellant, the driver tried to confiscate the gun and a struggle ensued. A gunshot went off and the struggle continued. Appellant stated that, at one point, he had the gun in his right hand and the driver in a headlock. Appellant stated that, as he was "sliding" out, the gun went off a second time. Appellant testified that the driver stopped struggling after the second shot.
Next, appellant went into an apartment building and started ringing doorbells. When a boy opened his apartment door, appellant asked to use the phone. Appellant wanted to call an ambulance, but ultimately decided not to call because he did not want the police questioning him. Appellant proceeded to ask the boy to come downstairs with him. Appellant testified that he made the request "[b]ecause I wanted to see was he dead or not."
Sheriff Deputy Everett Hall also testified on appellant's behalf. After appellant's arraignment, Deputy Hall transported appellant from the courtroom to jail. Although appellant had been repeatedly advised by his attorney and Deputy Hall not to talk, he told the deputy that:
 * * * [H]e had got a cab to his mother's house. When he got there he didn't have any money to pay the cab driver. The cab driver wouldn't let him leave. He got scared. Didn't mean to shoot the guy.
Hall indicated that appellant never mentioned anyone named Lynell and never mentioned going to the shopping mall.
As noted above, the jury found appellant guilty of two counts of aggravated murder and the lesser-included offense of murder. The jury also found appellant guilty of aggravated robbery, kidnapping, carrying a concealed weapon and the receiving stolen property charge concerning the gun used in the homicide. In addition, the trial court found appellant guilty of having a weapon while under disability. However, the jury found appellant not guilty of the burglary charge, which involved appellant's unlawful entry into Thomas' apartment. Furthermore, at appellee's request, the trial court dismissed the charge of receiving stolen property regarding Thomas' jewelry and electronic items.
At the sentencing hearing, the trial court merged the aggravated murder and murder convictions, and sentenced appellant to life imprisonment without parole eligibility. The court also merged the aggravated robbery conviction with the kidnapping conviction, and sentenced appellant to ten years imprisonment, to be served consecutively with the other prison terms imposed. As to the receiving stolen property conviction, the trial court sentenced appellant to a consecutive term of eighteen months in prison. The court also imposed a consecutive sentence of eighteen-months imprisonment for appellant's conviction of carrying a concealed weapon, and a consecutive sentence of twelve-months imprisonment for the weapon under disability conviction. Finally, the court announced that the firearm specifications merged and imposed one consecutive three-year prison term on the specifications.
Appellant appeals, raising the following assignments of error:
ASSIGNMENT OF ERROR NUMBER ONE:
 THE TRIAL COURT ERRED WHEN IT IMPOSED TWO CONSECUTIVE THREE-YEAR TERMS OF IMPRISON-MENT ON THE DEFENDANT FOR THE FIREARM SPECIFICATIONS WHEN THE UNDERLYING FELONIES WERE COMMITTED AS PART OF THE SAME TRANS-ACTION AND WHEN THE SENTENCE IMPOSED IN THE JUDGMENT ENTRY VARIED FROM THE ORAL PRO-NOUNCEMENT OF THE SENTENCE.
 ASSIGNMENT OF ERROR NUMBER TWO:
 THE TRIAL COURT ERRED WHEN IT OVERRULED THE DEFENDANT'S OBJECTION TO CRITICAL HEARSAY EVIDENCE WITH REGARD TO A VIGOROUSLY CON-TESTED AND HIGHLY PREJUDICIAL FACT.
 ASSIGNMENT OF ERROR NUMBER THREE:
 THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE, OVER THE OBJECTION OF THE DEFENDANT, TO PRESENT REBUTTAL CHARACTER EVIDENCE THAT THE DECEDENT WAS A VERY NICE PERSON, WHO WAS GENTLE AND NONAGGRESSIVE, IN ITS CASE-IN-CHIEF BEFORE THE DEFENDANT HAD EVEN PUT THE CHARACTER EVIDENCE OF THE DECEDENT INTO ISSUE.
 ASSIGNMENT OF ERROR NUMBER FOUR:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDG-MENT AGAINST THE DEFENDANT ON THE CONVICTION FOR AGGRAVATED MURDER WHEN THE EVIDENCE DID NOT ESTABLISH BEYOND A REASONABLE DOUBT THAT THE DEFENDANT "PURPOSELY" CAUSED THE DEATH OF ANOTHER.
 ASSIGNMENT OF ERROR NUMBER FIVE:
 THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY THAT PURPOSE TO CAUSE DEATH COULD BE INFERRED FROM THE FACT THAT THE INJURY WAS INFLICTED WITH A DEADLY WEAPON.
 ASSIGNMENT OF ERROR NUMBER SIX:
 THE TRIAL COURT ERRED WHEN IT IMPOSED CONSECUTIVE SENTENCES UPON A TERM OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE.
We begin with appellant's second assignment of error, which concerns Detective Kallay's testimony about a conversation he had with Michael Wright, the operations manager of the cab company associated with Ndiath. According to Detective Kallay, Wright told him that an "individual identifying himself as David" requested a cab. Appellant argues that the "David" statement constitutes hearsay. Thus, according to appellant, the trial court committed reversible error in allowing the testimony over his trial counsel's objection. We disagree.
Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is inadmissible unless otherwise provided by well-recognized exclusions or exceptions to the hearsay rule. Evid.R. 802. Here, the "David" statement contains multiple out-of-court statements. Detective Kallay testified about an out-of-court statement he received from Wright regarding an out-of-court statement the cab company received from an individual purporting to be "David."
In State v. Brown (Oct. 14, 1992), Summit App. No. 15457, unreported, the Ninth District Court of Appeals addressed a similar issue concerning multiple hearsay. The defendant in Brown was charged with several counts of aggravated robbery. The defense wanted to introduce testimony from Helen Brown, which would have indicated that "Joanne Smith * * * told Helen Brown that she heard Janet Goudy * * * say that Goudy saw the person who committed one of the robberies, and that person was not Brown." The appellate court concluded that Helen Brown's testimony was inadmissible hearsay. The court reasoned that "the statements were offered to prove the truth of the matter asserted — what Smith said that Goudy said."
Similarly, here, Detective Kallay's statement was offered for its truth, in particular Wright's claim to the detective that a man purporting to be "David" called the cab company. As such, the statement was offered for its truth and constitutes hearsay. Appellee contends that the "David" statement is nonetheless admissible because the testimony explains particular steps in Detective Kallay's investigation. We agree that an out-of-court statement is generally admissible when offered to explain a police officer's conduct while investigating a crime. See State v. Thomas (1980), 61 Ohio St.2d 223, 232. However, we have previously recognized that, where out-of-court statements are admitted to explain a police officer's conduct during the course of an investigation, "the potential for abuse in admitting such statements is great." State v. Blevins (1987), 36 Ohio App.3d 147, 149. As an example, a prosecutor might use a police officer's testimony regarding his investigative activities as a pretext to introduce improper statements. State v. Sinkfield (Oct. 2, 1998), Montgomery App. No. 16277, unreported. Therefore, to limit the potential for abuse, we have held, in pertinent part, that the conduct to be explained should be "relevant, equivocal and contemporaneous." Blevins, at 149.
Here, the "David" statement fails to explain any relevant or contemporaneous conduct by Detective Kallay. The detective's initial pursuit of "David" is immaterial because this case involved whether appellant, not "David," killed Ndiath. As well, the record demonstrates that Detective Kallay's pursuit of "David" did not lead to appellant's apprehension. As noted above, appellant was apprehended after fleeing from Officers Brooks and Bolt, who were attempting to cite him for riding a bicycle without a headlight at night.
Accordingly, Blevins prohibits the "David" statement from being admissible under the theory that it explains particular steps in Detective Kallay's investigation. We further conclude that the statement does not fit within any other recognized exclusion or exception to the hearsay rule. Therefore, the "David" statement constitutes inadmissible hearsay and the trial court erred in allowing the testimony. However, we must determine whether the trial court's error constitutes harmless error. See State v. Kidder (1987), 32 Ohio St.3d 279, 284; State v.Sorrels (1991), 71 Ohio App.3d 162, 165. If the evidence in favor of conviction, absent the hearsay, is overwhelming, we may properly conclude beyond a reasonable doubt that the trial court's error is harmless.Kidder, at 284. Our judgment is based on our own reading of the record and on what we determine is the probable impact the statement had on the jury. Id., quoting Harrington v. California (1969), 395 U.S. 250, 254. A conviction will not be reversed if the trial court's error is harmless. State v. Brown (1992), 65 Ohio St.3d 483, 485.
Here, appellant contends that the trial court's error requires us to reverse the aggravated robbery, kidnapping and merged aggravated murder convictions. However, as noted below, the "David" statement was not a necessary component of these convictions.
R.C. 2911.01(A) defines aggravated robbery and makes it unlawful for a person, in pertinent part, to either use a deadly weapon or inflict serious physical harm on another while attempting or committing a theft offense. In this case, appellant's plan to commit robbery is demonstrated in a number of ways. Appellant had no money for the cab he requested. He entered the cab armed with a deadly weapon and directed Ndiath to drive a very short distance to the back part of the apartment complex near a wooded area. The record also demonstrates that appellant attempted to commit the theft offense with a deadly weapon and that the offense resulted in Ndiath receiving serious physical harm, which, in this case, constituted death. Thus, we conclude that the jury had overwhelming evidence to convict appellant of aggravated robbery and was not required to rely on the "David" statement to sustain the conviction. As such, the admission of the "David" statement constitutes harmless error as to the aggravated robbery conviction.
We further find overwhelming evidence in support of appellant's kidnapping conviction. Under R.C. 2905.01, a person is guilty of kidnapping if he or she restrains the liberty of another or removes another "from the place where the other person is found" by force, threat or deception to "facilitate the commission of any felony" or to terrorize, or inflict serious physical harm on the victim. Kidnapping does not depend on the distance a victim is removed or the manner the victim is restrained. 1974 Committee Comment to R.C. 2905.01. Rather, "it depends on whether the removal or restraint is such as to place the victim in the offender's power and beyond immediate help, even though temporarily." Id. Here, appellant committed the kidnapping offense in various ways. First, as noted above, the record establishes appellant's forcing Ndiath to drive his cab a short distance to the back of the apartment complex so that appellant could commit a robbery offense. Second, the record indicates that appellant forcibly moved Ndiath in various parts of the cab while committing the aggravated robbery. Indeed, appellant's own testimony describes Ndiath being flipped around in various parts of the cab. Lastly, the evidence demonstrates that appellant restrained Ndiath's liberty to shoot him. Again, appellant's own testimony indicates that he had Ndiath in a headlock prior to the time the fatal shot was fired. Accordingly, we conclude that the admission of the "David" statement constitutes harmless error as to appellant's kidnapping conviction.
Finally, the record contains overwhelming evidence in support of appellant's merged aggravated murder convictions. Aggravated murder involves the purposeful killing of another while committing or attempting to commit, in pertinent part, kidnapping and aggravated robbery. R.C.2903.01(B). As noted below, the nature of Ndiath's fatal wound and appellant's demeanor and fabrications after the shooting establish that appellant purposely killed Ndiath while committing the kidnapping offense and attempting to commit the robbery offense. Therefore, we conclude that the trial court committed harmless error as to appellant's merged aggravated murder convictions when it allowed Detective Kallay to provide the "David" statement.
Accordingly, based on the above, we overrule appellant's second assignment of error.
In his third assignment of error, appellant contends that the trial court committed reversible error in allowing Wright to testify that Ndiath was a "very gentle person, nonagressive, nice guy." We disagree with appellant's contentions.
Evid.R. 404(A)(2) allows appellee to introduce "evidence of a character trait of peacefulness of the victim * * * in a homicide case to rebut evidence that the victim was the first aggressor." In this case, Wright testified about Ndiath's character during appellee's case-in-chief before appellant presented any evidence that the victim was the "first aggressor." Thus, as appellant contends, and as appellee concedes, the trial court erred in admitting the above character evidence during appellee's case-in-chief.
Nonetheless, appellee contends that, eventually, the character evidence would have been admissible because appellant later put on evidence that Ndiath was the "first aggressor." However, appellant merely testified that Ndiath grabbed his wrist when the gun fell out of his waistband and that Ndiath tried to confiscate the gun. We may reasonably conclude from the above evidence that Ndiath was not acting as a "first aggressor," but was acting for his own safety. Moreover, because appellant did not claim to have killed Ndiath in self-defense, the issue of who was the "first aggressor," as contemplated by Evid.R. 404(A)(2), never materialized in this case. See State v. Austin (1996), 115 Ohio App.3d 761, 765 (noting that an accused injects the issue of the victim's character into a case by coupling self-defense with evidence of first aggression by the victim in a homicide case); United States v. Kelley (C.A.8, 1976), 545 F.2d 619,623 (examining similarly worded Fed.R.Evid.R. 404 and concluding that the question of "first aggressor" is irrelevant if the defendant does not assert self-defense). As noted by the Staff Notes to Evid.R. 404, "[t]he character of the victim is seldom relevant evidence in a criminal prosecution. Where self-defense is asserted by the accused, the character of the victim bears directly on the issue of self-defense."
Accordingly, based on the above, we conclude that appellee had no opportunity to place Ndiath's character of peacefulness in evidence. As such, the trial court erred in allowing the character testimony.
As in the second assignment of error, appellant contends that the trial court's error requires us to reverse the aggravated robbery, kidnapping and merged aggravated murder convictions. However, as noted above, there is overwhelming evidence in favor of these convictions and, thus, the trial court's error in allowing the character evidence constitutes harmless, non-reversible error. See Kidder, at 284.
As such, we overrule appellant's third assignment of error.
Appellant's fourth assignment of error concerns the evidence supporting his aggravated murder convictions. As noted above, to sustain a conviction for aggravated murder, appellee was required to prove that appellant "purposely" caused the death of Ndiath. R.C. 2903.01(B). A person acts purposely when it is his or her specific intention to cause a certain result. R.C. 2901.22(A).
Appellant contends that his aggravated murder convictions are based on insufficient evidence because the record fails to establish that he acted with purpose to kill Ndiath. In particular, appellant argues that Ndiath was killed during a struggle and, therefore, the jury could not find beyond a reasonable doubt that the killing was purposeful rather than accidental. We disagree with appellant's contentions.
Sufficiency of evidence is the legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict.State v. Thompkins (1997), 78 Ohio St.3d 380, 386. When reviewing whether a verdict is supported by sufficient evidence, an appellate court examines the evidence in the light most favorable to the prosecution and concludes whether any rational trier of fact could have found essential elements of the crime proven beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, followingJackson v. Virginia (1979), 443 U.S. 307. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Jenks, at 273.
Here, the evidence establishes that appellant fired two shots at Ndiath. One of the shots resulted in a nearly straight-in gunshot wound at the back of the victim's neck, injuring his spinal cord. According to Dr. Fardal, this shot immediately rendered Ndiath unable to do "voluntary motions, and this is where the nerves come off to your heart, et cetera, so he wouldn't have survived very long after sustaining this gunshot wound." Given the vital nature of the neck area where the fatal shot occurred, the jury was allowed to infer that appellant had a purpose to kill Ndiath. If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause the death may be inferred from the use of the weapon.State v. Stallings (2000), 89 Ohio St.3d 280, 291; State v. Campbell
(1994), 69 Ohio St.3d 38, 49. The places where the bullets entered the body and resulting wounds are all probative evidence of a purpose to cause death. State v. Strodes (1976), 48 Ohio St.2d 113, 116, death penalty vacated (1978), 438 U.S. 911.
Furthermore, the overall surrounding facts and circumstances of this case provide for an inference that appellant harbored a purpose to kill Ndiath. See In re Washington (1998), 81 Ohio St.3d 337, 340. The fatal shot was directed too perfectly at the back of Ndiath's neck to suggest a haphazard shot resulting from a struggle. As well, appellant never called an ambulance after the shooting and generally displayed no concerns for Ndiath's well being after the shooting. Indeed, Dudley saw appellant immediately after the shooting occurred and described appellant as having a normal and calm demeanor. Furthermore, appellant displayed conduct reflecting a consciousness of guilt by twice asking his girlfriend to provide him with a false alibi. See State v. Richey
(1992), 64 Ohio St.3d 353, 357 (recognizing that a defendant's efforts to cover up a crime reflect his or her consciousness of guilt).
Accordingly, based on the above, we conclude that the record contains sufficient evidence in support of appellant's aggravated murder convictions.
Appellant next contends in his fourth assignment of error that his aggravated murder convictions are against the manifest weight of the evidence. We disagree. In reviewing whether a verdict is against the manifest weight of the evidence, we sit as a "thirteenth juror."Thompkins, at 387. Thus, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id. Additionally, we determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. (quoting State v. Martin
[1983], 20 Ohio App.3d 172, 175); see, also, Columbus v. Henry (1995),105 Ohio App.3d 545, 547-548. Reversing a conviction as being against the manifest weight of the evidence is one reserved for only the most "exceptional case in which the evidence weighs heavily against the conviction." Thompkins, at 387.
Appellant contends that his convictions are against the manifest weight of the evidence because he was able to put on credible evidence demonstrating that the shooting was accidental, rather than purposeful. However, a conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony. State v. Craig
(Mar. 23, 2000), Franklin App. No. 99AP-739, unreported. Credibility determinations on conflicting testimony are issues primarily reserved to the trier of fact to be second-guessed only in the most exceptional case. In re Jerome Fisher (June 25, 1998), Franklin App. No. 97APF10-1356, unreported.
Moreover, the jury was not required to accept the view that the struggle was ongoing when appellant fired the fatal shot. As we indicated above, the fatal shot was directed too perfectly at the back of Ndiath's neck to suggest an ongoing struggle. Additionally, the jury was not required to believe appellant's version of events. Appellant has demonstrated that he lacks credibility and admitted to repeatedly lying to his friends and the police by denying any involvement in the death of Ndiath. Once appellant finally admitted to calling a cab, he repeatedly changed his story about why he called the cab. Appellant told a deputy sheriff that he called the cab to go to his mother's house. However, at trial, appellant testified that he called the cab to pick up his friend "Lynell," whose last name and phone number he was unable to provide. Furthermore, appellant twice asked his girlfriend to participate in his attempt to deceive by asking her to provide him with a false alibi.
Accordingly, we conclude that the jury did not clearly lose its way or act unreasonably when it chose to disbelieve appellant's version of events and find him guilty of aggravated murder. As such, appellant's aggravated murder convictions are not against the manifest weight of the evidence.
Therefore, based on the above, we overrule appellant's fourth assignment of error.
In his fifth assignment of error, appellant contends that the trial court erred when it gave the following jury instruction:
 * * * [I]f a wound is inflicted with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon along with all of the other facts and circumstances in evidence. * * *
According to appellant, the instruction represents an improper comment by the trial court on the facts of the case. We disagree.
The record indicates that appellant did not object to the instruction. Thus, appellant waived any error pertaining to the jury instruction, absent plain error. Crim.R. 30(A); Stallings, at 292. We cannot find plain error unless we find that, but for the error, the outcome of the trial would clearly have been different. State v. Moreland (1990),50 Ohio St.3d 58, 62, citing State v. Long (1978), 53 Ohio St.2d 91, paragraph two of the syllabus; State v. Underwood (1983), 3 Ohio St.3d 12, syllabus. The plain error rule is to be invoked only in exceptional circumstances to avoid a clear miscarriage of justice. Long, at paragraph three of the syllabus.
In State v. Smith (Aug. 28, 1990), Franklin App. No. 90AP-6, unreported, we rejected the contention that a trial court states an improper comment on the facts when it gives a jury instruction on inferring purpose from use of a deadly weapon. Rather, we concluded that the instruction "was a correct statement of applicable law and did not place undue weight upon a particular part of the evidence." Id.; see, also, State v. Montgomery (Sept. 26, 2000), Franklin App. No. 99AP-1198, unreported (relying on Smith in rejecting a defendant's contention that the jury instruction on inferring purpose from use of a deadly weapon constitutes an improper judicial comment).
Accordingly, the trial court committed no error, plain error or otherwise, when it provided the above instruction on inferring purpose from use of a deadly weapon. As such, we overrule appellant's fifth assignment of error.
Appellant's sixth assignment of error concerns the trial court's decision to impose consecutive sentences of imprisonment on appellant.
R.C. 2929.14(E)(4) governs when trial courts may impose consecutive sentences of imprisonment on an offender and states:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
Here, the trial court made findings and explanations indicating that the elements in R.C. 2929.14(E)(4) exist in this case and allow for consecutive service. However, appellant contends that the elements in R.C. 2929.14(E)(4) cannot be satisfied because the trial court sentenced him to life in prison without parole eligibility. We disagree.
Because appellant is serving a life sentence, consecutive service is not necessary to punish appellant for his crimes. However, we recognize that consecutive service is necessary to protect the public from future crime. Deterring others from the manner of crime committed by appellant is a factor in determining whether consecutive service is necessary to protect the public from future crime. See R.C. 2929.11(A). As noted below, appellant committed a series of heinous crimes on Ndiath. Consecutive sentences in this case serve as a deterrent because anyone desiring to mirror appellant's criminal acts does so with the understanding that it will result in a severe punishment. Indeed, to require concurrent sentencing in this case would essentially tell others who would commit aggravated murder that non-merged accompanying crimes would go unpunished.
The record also establishes that consecutive sentences are not disproportionate to the seriousness of appellant's crimes. Appellant subjected Ndiath to a series of terrorizing acts culminating in Ndiath being shot in an execution-like manner. Concurrent sentencing on these crimes would only amount to a multiple offense "discount" that would not reflect the seriousness of appellant's criminal conduct. For these same reasons, we conclude that the "harm caused by the multiple offenses in this case was so great that no single prison term for any of the offenses committed as a single course of conduct" adequately reflects the seriousness of appellant's conduct, thereby satisfying R.C. 2929.14
(E)(4)(b).
Because the record satisfies R.C. 2929.14(E)(4)(b), the factors of this case need not satisfy R.C. 2929.14(E)(4)(c), which would require a finding that appellant's history of criminal conduct demonstrates that consecutive service is necessary to protect the public from appellant's future crime. Indeed, consecutive service may not be necessary to protect the public from appellant's future crime because the trial court permanently isolated appellant from society by imposing a life sentence of imprisonment. However, the language of R.C. 2929.14(E)(4) indicates that we must nonetheless determine whether consecutive sentences in this case are disproportionate to the danger appellant generally poses to the public. Appellant's conduct in this case demonstrates his serious disregard for the law and the safety of others. In addition to his actions, appellant's own testimony establishes the danger he generally poses to the public. Appellant admitted to engaging in a series of break-ins at the apartment complex. He also admitted to being a drug dealer who routinely arms himself. Accordingly, we conclude that consecutive service in this case is not disproportionate to the danger appellant generally poses to the public.
As such, the record satisfies elements in R.C. 2929.14(E)(4) allowing the trial court to impose consecutive sentences on appellant. Therefore, based on the above, we overrule appellant's sixth assignment of error.
Appellant's first assignment of error concerns his sentence on the firearm specifications. As noted above, appellant's aggravated murder, murder, aggravated robbery and kidnapping convictions contained firearm specifications. At the sentencing hearing, the trial court told appellant that he was to serve "a three-year sentence on every one of the gun specifications, but they all merge into one, so there's one three-year gun spec." However, in its judgment entry, the trial court imposed a three-year prison term on the firearm specification attached to the merged aggravated murder and murder counts, and an additional consecutive three-year prison term for the firearm specification attached to the aggravated robbery count, which merged with the kidnapping count. Appellant contends, and appellee concedes, that the trial court erred in imposing the above sentence in the judgment entry because it varied from the sentence it announced in appellant's presence. We agree.
We have previously held that a trial court errs when it issues a judgment entry imposing a sentence on a defendant that differs from the sentence announced in the defendant's presence. State v. White (Dec. 9, 1999), Franklin App. No. 99AP-32, unreported; State v. Fredenburg (Sept. 17, 1998), Franklin App. No. 97APA10-1340, unreported; State v. Berry
(June 29, 1999), Franklin App. No. 97AP-964, unreported; State v. Jones
(March 18, 1999), Franklin App. No. 98AP-639, unreported. A defendant has the right to be present when sentence is imposed, including re-sentencing if the court determines that the sentence should be changed. Jones. Accordingly, we conclude that the trial court erred in issuing a judgment entry that imposed a sentence on appellant for the firearm specifications that differed from the sentence announced in appellant's presence. Therefore, we sustain appellant's first assignment of error as it relates to the variance in sentencing. However, because of our decision on this matter, we render moot appellant's first assignment of error as it relates to whether specific provisions of the sentencing statute precluded the trial court from issuing two consecutive three-year terms of imprisonment on the firearm specifications. App.R. 12(A)(1)(c).
In summary, we overrule appellant's second, third, fourth, fifth and sixth assignments of error. Appellant's first assignment of error is sustained in part and rendered moot in part. Accordingly, we affirm the judgment of conviction of the Franklin County Court of Common Pleas, but reverse that portion of the judgment imposing the sentence on the firearm specifications. As such, this cause is remanded to the trial court for further proceedings consistent with this opinion.
 ___________ KENNEDY, J.
BOWMAN and PETREE, JJ., concur.