The STATE of Ohio, Appellee,

v.

AUSTIN, Appellant.

[Cite as *State v. Austin* (1996), 115 Ohio App.3d 761.]

Court of Appeals of Ohio,
Seventh District, Mahoning County.

No. 94 C.A. 71.

Decided Nov. 25, 1996.

*James A. Philomena,* Mahoning County Prosecuting Attorney, and *Michele G. Cerni,* Assistant Prosecuting Attorney, for appellee.

*Charles E. Curry,* for appellant.

JOSEPH E. O'NEILL, Presiding Judge.

This timely appeal arises from a jury verdict finding defendant-appellant guilty of murder in violation of R.C. 2903.02(A)(B) with a firearms specification.

At or about 3:00 P.M. on January 11, 1993, the appellant was involved in a traffic accident with Clarence Jones. Jones was apparently at fault because, as he approached the intersection of Albert Street and McGuffey Road, Jones drove his automobile into the back of an automobile being driven by the appellant. The automobile that the appellant was driving was owned by Tracy Wilkes, a notorious drug dealer. A passenger in Jones's car, his girlfriend, Nakia Lewis, testified at trial that Austin initially exited the car holding a handgun. However, because Austin and Jones knew each other and were on friendly terms, any ill feelings at the scene of the accident were quickly defused.

Austin and Jones quickly notified Wilkes of what had happened, and the two each agreed to pay Wilkes $250 each for the damages to Wilkes's automobile. Austin and Jones then parted amiably. Sometime later, Austin was informed that Jones had expressed to persons that he was not going to contribute to payment for the damage to the Wilkes's car. Austin saw Jones driving his automobile about the Kimmel Housing Project. When Jones's car came to a stop, Austin entered the car, and then he and Jones proceeded to drive about. Austin testified that, as soon as he entered Jones's automobile, Jones started to berate

him, cursing and threatening him. Austin went on to testify that, when Jones stopped at a traffic light, he reached down beside his left leg and drew a gun. When Austin saw the gun, he immediately feared that he was going to be killed and drew a gun from the pocket of his jacket and shot and killed Jones.

The first assignment of error complains that the court erred in sustaining the prosecution's objection against allowing defendant to testify concerning what defendant knew about the character of the victim.

During the direct examination of the appellant, the following dialogue took place:

"Q. Past the mall. Okay. Now, how do you know that Clarence Jones carried a gun?

"A. Because I seen him use it before.

"Q. Seen him use it how?

"A. Shot up a car before. It wasn't like—it was a car riding through and he had shot it up. That's what happened.

"Q. Ever seen Clarence mad before?

"A. Yeah.

"Q. Mad at who?

"A. He was beating up LeShawn Carter.

"MR. BAILEY: Objection. I'm going to ask to approach the bench to have a side bar for a moment.

"THE COURT: Please.

" * * *

"MR. BAILEY: Your Honor, I also want to—I am giving the defense notice, I believe the defense has opened the door. He's bringing out the victim's propensity for violence and I believe he opens the door for the Defendant's character at this point for violence. He's claiming self defense and claiming now that the victim is of violent character, and it now opens the door as to cross examination of this witness as to any violent acts by the Defendant to rebut that type of testimony.

"MR. PALUMBARO [Counsel for the defendant]: Wait a minute. Okay. Might be right but only about testimony with regards to Clarence Jones not anybody else.

"THE COURT: Albert, you can't impugn the character of the decedent without having your character being on board also at the same time. What is good for the goose has got to be good for the gander. If you're saying the

decedent was of a violent nature, you know the Defendant opens the door for himself at the same time.

"MR. PALUMBARO: Evidence of a violent and dangerous nature of a victim is generally admissible where the Defendant pleads self defense. Rebuttal evidence may then be offered by the prosecution that rebuttal evidence is the nature of the victim only not the Defendant in this case. We are not opening any door. We admit we had a gun. I'll stop that testimony right now.

"THE COURT: Okay. I'll sustain your objection. Let's go."

Initially, we somewhat question whether it is proper to raise this assignment of error. It would appear that counsel for the defendant abandoned his approach in attacking the character of the decedent. On the other hand, we do not find that there was any proffer by the appellant wherein the character of the decedent would have at least been placed before this court to determine whether there was any prejudice in the possible error. Regardless, we shall proceed to discuss and dispose of this assignment of error.

■ A defendant arguing self-defense may testify about specific instances of the victim's prior conduct in order to establish the defendant's state of mind.

"A defendant, when arguing self-defense, may testify about specific instances of the victim's prior conduct in order to establish the defendant's state of mind. These events are admissible in evidence, not because they establish something about the victim's character, but because they tend to show why the defendant believed the victim would kill or severely injure him." *State v. Carlson* (1986), 31 Ohio App.3d 72, 31 OBR 112, 508 N.E.2d 999, paragraph one of the syllabus. See, also, *State v. Roderick* (1907), 77 Ohio St. 301, 82 N.E. 1082.

■ We do not agree with the trial judge's ruling that if the defendant were to delve into the character of the decedent, the defendant would be opening the door to cross-examination or direct evidence relative to his character. Evid.R. 404(A)(1) sets forth an instance where the character of an accused may be examined.

"(A) Character Evidence Generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:

"(1) *Character of Accused.* Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable.

"(2) *Character of Victim.* Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the

same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable." Evid.R. 404(A)(1)(2).

■ Evid.R. 404(A)(1) and (2) are mutually exclusive. When an accused injects the issue of the victim's character into the case, either by offering character evidence in accordance with Evid.R. 405 or by coupling self-defense with evidence of first aggression by the victim in a homicide case, the accused does not by virtue of these elections open the issue of the accused's own character. The issue of the accused's character is only introduced in accordance with the provisions of Evid.R. 404(A)(1) when the accused offers positive character evidence as prescribed by the procedures delineated in Evid.R. 405.

■ Regardless of the foregoing error, we cannot conclude that the error had anything to do with the outcome of the trial. The appellant testified at the trial and portrayed his actions in defending himself from the victim.

"A. And I had caught him and we got in the car. I was trying to strike a conversation with him about, umm, you know what happened, and what I heard because I talked to Tracy and Tracy said CJ said he wasn't paying nothing. And, umm, then after that I had tried to talk to him, and I got in the car with him, and I was like, you know, what's going on? And, umm, he was like, umm, man—I ain't trying to start talking foul at the mouth, you know—just going over, you know, asking—

"Q. What was he saying like?

"A. Like, umm, I can say it?

"Q. Yeah.

"A. He was like, umm, 'Fuck you, like, fuck you. I ain't paying shit you mother fuckers. I ain't scared of all of you. You mother fuckers all going to learn. You all going to learn.' And then—

"Q. He was talking like that to you?

"A. Yeah.

"Q. What was his tone of voice?

"A. It was high. The way he talked, you know, the way he talked normally, you could tell because, he, like, while he talked he was talking in a different tone. This was something new to me. And, umm, we got up on Bettman and increased his speed, you know, flew about—flew down Victor, and he was still flying. He going off. I'm like, 'Slow down, man.' He was like, nope. He was like, nope.

And he said, mother fucker, I'm going to get you all.' And when he turned, you know, we got at the light, at the red light, he turned around just like this (indicating), pointed the gun at me, dead to my face. I seen a gun in my face. First instinct was to turn around and shoot.

"Q.   Where did he get the gun from?

"A.   Under his left leg.

"Q.   This happened pretty quick?

"A.   Yeah.

"Q.   Real quick?

"A.   Like I say, you know, I don't remember. All I know it happened fast.

" * * *

"Q.   What type of gun was it?

"A.   It was a nine that he always used to carry. It was a nine. He carried it a lot, you know.

"Q.   Saw him with that gun before?

"A.   Yeah.

"Q.   Similar to the gun that you had?

"A.   No, it was just—it was bigger than the gun I had.

"Q.   You don't know what type of gun it was?

"A.   Nope, it was a nine I think.

"Q.   Do you know what type of gun you had?

"A.   Yeah.

"Q.   Do you know the model?

"A.   I don't know the model but I know it was a smaller version.

"Q.   Smaller than what he had?

"A.   Yeah."

"Q.   Come up to the light and you see a gun? What hand did he have the gun in?

"A.   His left hand.

"Q.   Where did he get it from?

"A.   From his left leg.

"Q.   Then what did you do immediately?

"A.   First when the gun was first drew I looked, and when I had turned this way the barrel was in my face, you know.

"Q.   Where was your hands?

"A.   My hands was just like this (indicating).

"Q.   You went into your coat—

"And went in the coat pocket and pulled my gun.   As I pulled my gun, I was shooting and at the same time I was trying to get the door open.

"Q.   Car started to move?

"A.   Car started to move.   After I hit him the car moved and just ran into the thing and I think that's how the door got open.   I don't know how the door got open to this day.   That's the same thing I told them.   I don't know how the door got open automatically, but I know I got it open somehow and I fell out of the car."

The appellant did not fire in self-defense because of any background information he might have possessed relative to the character of the accused.   He fired because of the immediate threat upon his life when the victim drew his gun and pointed it into the appellant's face.

The first assignment of error is found to be without merit.

■    The second assignment of error contends that the appellant's conviction should be reversed because the conviction was against the manifest weight of the evidence and the evidence was insufficient as a matter of law to prove the conviction beyond a reasonable doubt.

Under assignment of error number one we have already set forth the appellant's version of the shooting which resulted in the victim's death.   The prosecution called LaShawn Alita Jones.   This witness was the mother of two children whose father was the decedent.   This witness testified about meeting the defendant-appellant prior to the shooting.

"Q.   Now, when you went over to Linda Deltorio's, who was there when you went to drop off your children?

"A.   Michael Austin.

"Q.   Did you see him here today?

"A.   Yes, I do.

"Q.   Point him out.

"A.   Right there (indicating).

"Q.   Is this the man who you are referring to?

"A. Yes.

"MR. BAILEY: May the record reflect that the witness identified the Defendant.

"By Mr. Bailey

"Q. Now, did you have any conversation with the Defendant at that time?

"A. Yes.

"Q. What did he tell you?

"A. When I walked in he told me—he says CJ—'Tell CJ to chalk it.'

"Q. 'Chalk it'—

"A. Yes.

"Q. —means what?

"A. Take it as a loss.

"Q. Take it as a loss. Chalk it up?

"A. Uh-hum.

"Q. Do you know what he was talking about?

"A. No, not at the time.

"Q. Did he explain to you what he was talking about?

"A. Yes.

"Q. What did he tell you?

"A. He told me that, umm, earlier that day—I mean CJ had got into a car, got in a wreck at a gas station and, umm, what else? Umm, then from there he said that CJ better have his money, and I told him I was between them two.

"Q. Okay. Now when he told you that CJ better have his money, did he say what he would do if CJ didn't have his money?

"A. Yes, he did.

"Q. What did he tell you?

"A. He said he was going to shoot him.

"Q. Now, did he show you any type of a weapon?

"A. Yes.

"Q. What did he show you?

"A. He had a gun already in his, like, hand.

"Q. What kind of gun was this?

"A. Umm, it had a clip to it. I don't know. I ain't for sure. I'm not for sure."

The prosecution also presented witnesses who entered the decedent's car immediately after the shooting. Under direct examination, none of these parties said that they found a gun in the victim's car. Apparently, the jury afforded no weight or credibility to the defendant's recitation as to what happened at the time of the shooting.

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)" *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

In its conclusion in the *Jenks* case, a unanimous Supreme Court stated, at 283, 574 N.E.2d at 510, as follows:

"Moreover, we have refined the standard of appellate review from a criminal conviction to reflect our rejection of the circumstantial evidence rule. An appellate court will no longer conduct a review of the evidence to determine if the state's theory of guilt is irreconcilable with any reasonable theory of innocence. If the jury is convinced that the prosecution has proven that the accused is guilty beyond a reasonable doubt, we can require no more. Likewise, where an appellate court determines there is sufficient probative evidence to support the jury's finding, it should affirm the conviction. However, nothing in our decision today changes the reviewing court's duty, when called upon, to examine the record evidence in the light most favorable to the prosecution to determine whether there was substantial, probative evidence to support a guilty verdict. More important, nothing in this opinion alters the state's heavy burden in a criminal case, which remains proof of guilt beyond a reasonable doubt."

The elements of murder, as set forth in R.C. 2903.02, are:

"(A) No person shall purposely cause the death of another."

Appellant admitted before the jurors that he purposely caused the death of the decedent. However, he insisted that he caused the death of the decedent in defending himself. In his version, the defendant testified that the decedent drew a gun and pointed it at him, causing him to be fearful for his life. Following the shooting, a gun was not discovered on the body of the decedent or about him in his automobile. We can reasonably conclude that the jurors afforded no credibili-

ty to the appellant's version of self-defense and instead simply found, which they were justified in doing, that he had purposely caused the death of another.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

GENE DONOFRIO and COX, JJ., concur.