No. 92,592

STATE OF KANSAS, *Appellee,* v. FREDERICK DEAN WALTERS, *Appellant.*
(159 P.3d 174)

Opinion filed June 8, 2007.

*Michelle Davis*, of Kansas Appellate Defender Office, argued the cause, and *Nathan B. Webb*, of the same office, was with her on the briefs for appellant.

*Edmond Brancart*, deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Phill Kline*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, J.: A jury convicted Frederick Dean Walters of voluntary manslaughter for shotgunning Matt Cochran, the ex-husband of his girlfriend, Kristen Lentz. The Court of Appeals affirmed in *State v. Walters*, No. 92,592, unpublished opinion filed May 26, 2006. Walters argues the district court denied his fundamental right to a fair trial by excluding key pieces of evidence establishing that his actions were in self-defense. Our jurisdiction is under K.S.A. 20-3018(b).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in excluding the following:
    a. Evidence of Cochran's standoff with Gardner police? Yes.
    b. A photograph of Cochran holding a handgun in his vehicle? Yes.
    c. Testimony from Lentz' sister regarding a specific threat made by Cochran toward Lentz and Walters? No.
    d. Evidence that Cochran had not been prosecuted for previous incidents? No.
2. Was the exclusion of any evidence reversible error? No.

Accordingly, we affirm the judgments of the Court of Appeals and district court.

## FACTS

On April 23, 2003, Frederick Dean Walters, his girlfriend Kristen Lentz, and Brett Bierman were at Walters' home in Kansas City, Kansas. Lentz' ex-husband, Matt Cochran, drove to the house to make contact with her. Walters killed Cochran with a shotgun blast to the head and was later charged with one count of second-degree murder.

In February 2004, the State filed a motion in limine to exclude evidence of a number of Cochran's bad acts and Cochran's prior arrests, and encounters with police, *e.g.*, a January 2003 standoff in Gardner, Kansas. Defense counsel opposed the motion because Walters was claiming self-defense, and the proffered evidence would be offered to establish both his state of mind and the reasonableness of his conduct.

"Basically, Your Honor, all of these documents and all of the evidence we're trying to introduce is that, you know, he [Cochran] was acting irrationally when it came to his ex-wife, that he was doing threatening things, that would lead anyone to believe after they had been threatened by him as well to believe that he was unstable enough that the threat might be made good, and that he wasn't afraid to use guns against police officers."

The motion in limine was granted.

At trial Walters revisited the issue, seeking to admit evidence in support of his self-defense claim, including: (1) testimony about the standoff between Cochran and the Gardner police; (2) a photograph of Cochran in his vehicle holding a handgun below an outside viewer's line of sight; (3) a previous threat that Cochran was coming to Walters' house to kill everyone and commit suicide; and (4) evidence that Cochran had not previously been prosecuted for any of his acts because his father was a judge. The district court disallowed the evidence.

At trial, Walters' housemate, Brett Bierman, testified for the State. The day of the shooting, Bierman was working on his motorcycle in the attached garage with the door up. Around 6 p.m., he watched a white Ford Excursion with a trailer attachment pull up on the wrong side of the road in front of the house. An unknown

man, later identified as Cochran, sat in the Excursion, staring at the house. After approximately 5 minutes, Cochran drove away.

Five to 10 minutes later, Bierman again watched the Ford Excursion, now trailer-less, pull up in front. He came out of the garage and asked Cochran what he wanted. When Cochran replied that he wanted to talk to Lentz, Bierman told him that he had plenty of chances to speak with her in the past and that he needed to leave. Cochran "sat there for a few minutes kind of smirking" before he drove away.

After Cochran left, Bierman went into the house to talk with Walters. Bierman asked him "what was going to happen" if Cochran came back again. According to Bierman, Walters replied, "[I]f he comes on the property and starts any trouble [I will] shoot him." Bierman had not ever seen Cochran with a weapon. Although Walters had a cell phone on his person, he did not call the police.

According to Bierman, 5 to 10 minutes later Cochran drove back to the house a third time, got out of his Excursion, and walked toward the house. Bierman stayed in the garage and listened to what he thought was someone banging on the front of the house. After hearing glass break, he walked out of the garage with a large torque wrench in his hand. Bierman told Cochran he needed to leave. When Cochran smiled, Bierman headed toward him with the wrench; Cochran eventually retreated to his Excursion. Bierman then heard someone say, "[S]ee who laughs last."

Bierman testified that less than a minute after Cochran got inside his Excursion, Cochran started to drive away. Bierman watched as the Excursion turned up the driveway and hit another car. He then saw someone exit the passenger side and run away. He turned and saw Walters standing in the house doorway with a shotgun. When Bierman asked, "Did you shoot?," Walters replied that he had fired once in the air and once at Cochran. Walters then put down the shotgun and called 911. A redacted version of the call was played for the jury.

Gary Freeman next testified for the State. On the day of the shooting, he and Cochran were hauling scrap metal in a trailer pulled by a Ford Excursion. In the early afternoon, they drove to Walters' home because Cochran wanted to speak to Lentz. Twenty

to thirty minutes later, they drove back to Walters' home; Cochran honked the Excursion's horn but no one came out from the house. After Cochran placed an envelope on the windshield of a car in the driveway, they again drove away. After driving around, Cochran drove to Walters' home a third time to try to speak to Lentz.

According to Freeman, Cochran, without a weapon, got out of the Excursion and knocked on the house door. When no one answered, he knocked on a window. Walters then opened the door and fired a shotgun into the air; Cochran ran back to the still-running Excursion. Once inside, Cochran rolled down the window and called Walters "a pussy." Cochran then put the Excursion in gear and started to drive away. When the Excursion was in forward motion, Freeman heard another shotgun blast and saw glass flying. Cochran then slumped over the steering wheel, turning the Excursion across the street into another car. Freeman then fled the Excursion.

The next State witness was police officer Dennis McMillin, an accident reconstructionist. He testified that the glass debris indicated the Excursion was in motion when Cochran was shot.

The next State witness, forensic pathologist Erik Mitchell, testified that Cochran's autopsy revealed the presence of methamphetamine, amphetamine, marijuana, hydrocodone, dihydrocodeine, and methadone in his blood.

Kristen Lentz, Walters' girlfriend and Cochran's ex-wife, testified for the defense. She married Cochran in August 2001, but she moved out 5 months later. She stated that pressure associated with Cochran becoming a lawyer and his excessive drug use made him aggressive, temperamental, and violent. She called the police 4 or 5 times to settle domestic disputes between the two.

Lentz testified that after she moved out, Cochran harassed her in person at her work, her daughter's school, and her house, as well as over the phone. Once in March 2002, Cochran called her and said: "I will fucking kill you." In April 2003, he followed her when she left her job; he also threatened to kill Lentz, her mother, and her child. Lentz lost a job due to Cochran's behavior at her workplace. Cochran also wrote numerous letters to Lentz that were admitted into evidence.

Lentz stated that she filed a report with the police after Cochran attempted to provoke an argument by blocking her car with his. On another occasion, after a court hearing, Cochran crashed his car into hers. Because Lentz feared for her life "on a day-to-day basis," she filed for a protective order in September 2003. The next month, when the couple's divorce became final, the protective order was lifted, and a mutual restraining order took effect. Lentz admitted, however, that she contacted Cochran several times after filing for a protective order, and even threatened him on one occasion soon after they separated.

Lentz testified that she met the defendant, Walters, in August 2002. They dated until approximately January 2003. Approximately 4 days prior to the shooting incident, they got back together. Lentz told Walters about her previous relationship with Cochran and relayed the problems she was experiencing, including Cochran's threats. She also told Walters that Cochran was "very well-known for always having some type of weapon or that he had possession of weapons." In her opinion, Cochran "was not peaceful at all."

Also testifying for the defense was Lentz' mother, Kathrine Martin. After Cochran and Lentz separated, Lentz moved in with Martin. At that time, Cochran and Lentz were constantly calling each other. Martin kept a log of his phone calls and noted that Cochran had called 30 times in 1 day. Due to the excessive number of calls, Martin changed her phone number four times during the course of a year. When asked if she knew Cochran's reputation for peacefulness in the community, Martin testified that "he was not peaceful."

Walters then testified on his own behalf. After Walters began dating Lentz, Cochran would chase him home from work. Once Cochran passed Walters in his vehicle, slammed on his brakes, and threatened to kill him. Cochran also attempted to fight him in the Wal-Mart parking lot at Christmas; Walters was scared because Cochran was "too big." Walters also testified he had heard what Cochran had done to Lentz and her mother.

On the day of the shooting, Walters saw Cochran pass his house four or five times as he worked in the yard; Walters tried to ignore him. Cochran returned around 6 p.m. While Walters was inside

the house, several times he heard Cochran arguing with Bierman. Walters testified that he was scared and hoped Cochran would leave.

According to Walters, at some point Cochran approached the front door of the house. Several months earlier, Walters had told Cochran that if Cochran came onto his property again, Walters would shoot him. Earlier that evening, Walters had also told Lentz that if Cochran returned they could call the police, or Walters could shoot him. While Lentz was looking through the front door peephole, Cochran hit the door hard enough to knock her down. Walters then grabbed his shotgun. When asked why he did not call the police instead, Walters replied that he did not believe they would respond.

Walters then stuck the shotgun out the door in Cochran's face. He fired over Cochran's head because he did not want to kill him; he just wanted Cochran to leave. He was also worried that Cochran was under the influence of drugs. Walters admitted that after his shot, Cochran retreated to his Excursion. Although Cochran got back into his vehicle, Walters did not believe he was going to leave. Instead, he thought Cochran was retrieving a gun "because he was known for it." Cochran yelled at Walters from inside the Excursion, calling him a "wife beater" and shouting "we will see who laughs last."

Walters testified he believed that Cochran was going to shoot him. Due to the rain and the Excursion's tinted windows, Walters could not see inside. But because he believed he had no other choice, he then fired a second shot. According to Walters, the Excursion was not moving when he fired. The Excursion then began moving and turned into the neighbor's driveway. Later, Walters noticed that two Rottweiler dogs were also in the Excursion.

The jury convicted Walters of voluntary manslaughter, a lesser included offense of second-degree murder. He was sentenced to 59 months' imprisonment. The Court of Appeals affirmed Walters' conviction.

Other facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The district court erred in excluding certain evidence.*

Walters argues the district court denied his fundamental right to a fair trial by excluding important evidence establishing that his actions were in self-defense. Under the state and federal Constitutions, a defendant is entitled to present the theory of his or her defense, and the exclusion of evidence that is an integral part of that theory violates a defendant's fundamental right to a fair trial. *State v. White*, 279 Kan. 326, 331, 109 P.3d 1199 (2005). However, the right to present a defense is subject to statutory rules and case law interpretation of the rules of evidence and procedure. *State v. Patton*, 280 Kan. 146, Syl. ¶ 1, 120 P.3d 760 (2005).

*Standard of Review*

When a party challenges the admission or exclusion of evidence on appeal, the first inquiry is relevance. *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006). Unless otherwise prohibited, all relevant evidence is admissible. K.S.A. 60-407(f). "Relevant evidence" is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). A material or logical connection between the asserted facts and the inference or result they are intended to establish is necessary to establish relevance. 282 Kan. at 47 (citing *State v. Lumley*, 266 Kan. 939, 950-51, 976 P.2d 486 [1999]).

"Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. [Citation omitted.] When the adequacy of the *legal* basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo." 282 Kan. at 47-48.

*Self-defense considerations*

Walters claims that he acted in self-defense, a complete defense to the charges. The version of K.S.A. 21-3211 in effect at the time of the shooting outlined when a person was justified in using force against an aggressor as follows: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend

himself or another against such aggressor's imminent use of unlawful force."

Under our facts, the statute requires two separate inquiries. The first inquiry examines a defendant's subjective belief and requires evidence indicating that the defendant honestly and sincerely believed it would be necessary to kill in self-defense because of an aggressor's imminent use of unlawful force. A defendant's own assertions may be sufficient to establish this factor. See *Tyler v. Nelson*, 163 F.3d 1222, 1227 (10th Cir. 1999) (discussing Kansas law and citing *State v. Hill*, 242 Kan. 68, 744 P.2d 1228 [1987]). The second inquiry is objective and requires evidence showing that a reasonable person in the defendant's situation would have perceived the necessity of killing in self-defense. See 163 F.3d at 1227.

The jury was instructed on Walters' theory of self-defense and defense of another, and on second-degree murder's lesser included offense of voluntary manslaughter, an imperfect form of self-defense. See *State v. Ordway*, 261 Kan. 776, 787, 934 P.2d 94 (1997) ("imperfect right to self-defense manslaughter" covers intentional killings that result from an unreasonable but honest belief that deadly force was justified in self-defense). The jury convicted Walters of voluntary manslaughter.

*Evidence of Cochran's standoff with Gardner police.*

Walters first argues the district court erred in excluding evidence of Cochran's standoff with Gardner police on January 19, 2003, approximately 2 months before he killed Cochran. Defense counsel described the incident in a letter to the State as "a fifteen (15) hour standoff with Gardner police," and attached three newspaper clippings describing the incident. He proffered that Walters had read newspaper articles and watched television news accounts describing the incident, asserting, "If he believed that [the stand-off was] . . . true and that had some influence on his thought process or his state of mind at the time of this incident, it's crucial."

The State responded that K.S.A. 60-446, K.S.A. 60-447, and *State v. Mason*, 208 Kan. 39, 490 P.2d 418 (1971), precluded introduction of the evidence. The district court concluded that pur-

suant to K.S.A. 60-447, evidence of specific instances of Cochran's conduct would be excluded.

K.S.A. 60-446 provides:

"When a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct, subject, however, to the limitations of K.S.A. 60-447 and 60-448."

K.S.A. 60-447 provides in pertinent part:

"Subject to K.S.A. 60-448 when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that (a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible . . . ."

Based upon these two statutes, this court stated in *Mason*:

"Where self-defense is an issue in a homicide case, evidence of the turbulent character of the deceased is admissible. Such evidence may consist of the general reputation of the deceased in the community, but specific instances of misconduct may be shown only by evidence of conviction of a crime." 208 Kan. 39, Syl. ¶ 1.

Walters argued that the excluded specific instances of conduct were admissible because they were not being offered to prove a trait of Cochran, as contemplated by K.S.A. 60-446, K.S.A. 60-447, and *Mason*; rather, they were offered to establish Walters' state of mind. In support, he cited *State v. Burton*, 63 Kan. 602, Syl. ¶ 3, 66 Pac. 633 (1901), which held:

"Information conveyed before the killing to a party on trial for murder, who justifies on the ground of self-defense, that the deceased was a violent and turbulent man, and accustomed to go about armed, is admissible, whether the informant gained his knowledge from general reputation of the deceased or from personal observation of his specific acts. The rule that bad character in the respect mentioned can be established only by general reputation of the deceased in the community has no application to the admission of such testimony. *It is competent for the purpose of determining the state of mind of the accused at the time of the homicide*, and whether he was induced to believe in good faith that he was in imminent danger of death or great bodily harm at the hands of the person killed." (Emphasis added.)

Walters asserts that a number of state and federal courts allow a similar exception for the purpose of determining the state of mind

of the defendant when self-defense is raised. See *United States v. Burks*, 470 F.2d 432, 434 (D.C. Cir. 1972) ("As this Court has long recognized, evidence of the deceased's violent character, including evidence of specific violent acts, is admissible where a claim of self-defense is raised."); *Saylor v. Kentucky*, 144 S.W.3d 812, 815-16 (Ky. 2004) (discussing an exception for instances "when evidence of the victim's prior acts of violence, threats, and even hearsay evidence of such acts and threats, is offered to prove that the defendant so feared the victim that he believed it was necessary to use physical force [or deadly physical force] in self-protection"); *State v. Austin*, 115 Ohio App. 3d 761, 764, 686 N.E.2d 324 (1996) ("A defendant arguing self-defense may testify about specific instances of the victim's prior conduct in order to establish the defendant's state of mind."); *State v. Ventre*, 811 A.2d 1178, 1182 (R.I. 2002) (allowing specific instances of conduct when "state of mind and the reasonableness of [defendant's] fear were matters of key importance"); *Espinoza v. State*, 951 S.W.2d 100, 101 (Tex. App. 1997) (allowing evidence of specific violent acts of the victim previously known by the defendant in order to show the reasonableness of the defendant's claim of apprehension of danger).

Our Court of Appeals apparently assumed, but did not decide, that the evidence was admissible to show Walters' state of mind: "Assuming the exception recognized in *Burton* applies in the instant case, evidence of Cochran's standoff with police would be admissible so long as it is relevant, noncumulative, and more probative than prejudicial." Slip op. at 8-9. After hinting that the evidence was relevant, the court apparently held that it was cumulative, overly prejudicial, or both, and therefore the district court did not abuse its discretion in excluding it.

We conclude that the Gardner incident evidence was relevant under this line of cases, including *Burton*. It shows Walters' state of mind at the time of the shooting, *i.e.*, he feared Cochran and thought that Cochran was unstable enough to retrieve a gun and shoot.

Specifically, Walters referenced the incident in his 911 call reporting the shooting shortly after it occurred. Walters informed the operator that "[h]e was in a standoff with police in Gardner for 15

hours." Although this statement was redacted from the 911 tape played to the jury, its reference suggests it contributed to his conduct.

Additionally, Walters had read newspaper and television accounts of the incident and therefore would have known it specifically concerned some disturbing elements. The news articles which are in the record on appeal, proffered by his counsel, confirm that a "Gardner man [Cochran] barricaded himself inside his trailer . . . sparking a standoff with police that lasted more than 15 hours." They also reveal that a "neighbor called police . . . about 2 a.m. Sunday after hearing gunshots from . . . Cochran's house"; that "police were dispatched"; that a "SWAT team arrived about 45 minutes after the gunshots were reported"; that "someone who had been in the house told police that Cochran might have explosives"; that the SWAT team sent its robot to the door and Cochran tried to slam the door shut; that the neighborhood had to be evacuated; that police "used tear gas to get the man out"; that Cochran came out of his home with two Rottweilers; that Cochran, a lawyer, had been arrested January 16 at the Johnson County Courthouse for two counts of selling methamphetamine; and that as a result of the Gardner incident, Cochran had been charged with "felony counts of making a criminal threat and criminal use of explosives."

Our next analytical step is to determine whether the rules governing the incident's exclusion from evidence are applied as a matter of law or in the exercise of the district judge's discretion. When the adequacy of the legal basis of a district court judge's decision on exclusion of evidence is questioned, we review the decision de novo. *Gunby,* 282 Kan. at 47-48. Here, the court incorrectly relied upon K.S.A. 60-447. Accordingly, we hold the court erred as a matter of law. See *White,* 279 Kan. at 332 (" 'A district court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.' ") (Quoting *Koon v. United States,* 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 [1996]); see also *Gunby,* 282 Kan. at 56 (admissibility of other crimes and civil wrongs evidence is gov-

erned by K.S.A. 60-455; it may be that other crimes and civil wrongs evidence is relevant and admissible to prove a material fact other than the eight listed).

*Photograph of Cochran holding a gun in his vehicle.*

Next, Walters argues that the district court erred in excluding a photograph that his counsel described as one "of Matt Cochran holding a gun in his vehicle below the dashboard and out of the line of sight of those not inside the vehicle." At trial, Lentz was authenticating the photograph when the State objected to its admission. Defense counsel responded:

"This isn't illegal activity. She [Lentz] took both photos. One is with him holding a shotgun. One is with him holding a gun in a car. Basically my client [Walters] had seen those around the house before this incident and had it made clear to him Mr. Cochran had access to weapons and that goes to his state of mind."

The district court, however, determined that the photograph was not relevant. The Court of Appeals agreed. Slip op. at 10. The photograph is not included in the record on appeal.

Walters argues the photograph was admissible because the State repeatedly argued that no witnesses saw Cochran holding a gun or other weapon on the evening of his death. Walters argues that (1) because he had previously seen the photograph and it had been made known to him from Lentz that Cochran had a reputation for carrying guns, and (2) he believed Cochran "possessed guns and carried them out of sight in his vehicle," that it therefore was reasonable for him to believe that Cochran returned to the Excursion to retrieve a gun kept out of Walters' view. As additional evidence supporting Walters' concern about what Cochran was doing in the Excursion, he points out that his view was poor because the windows were tinted and it was raining.

We conclude that the photograph was relevant, *i.e.,* having a tendency in reason to prove that Walters believed Cochran was returning to his Excursion to retrieve a gun. The district court erred in excluding the photograph on relevancy grounds. Moreover, it was not cumulative of evidence concerning Cochran's general reputation for possessing some type of weapon because the photograph specifically shows Cochran concealing a gun in his vehicle.

*Testimony from Lentz' sister regarding a specific threat made by Cochran towards Lentz and Walters.*

Next, Walters argues the district court erred in excluding evidence of a specific threat made by Cochran. Defense counsel sought to call Becky Price, Walters' twin sister, to testify that Michelle Stevens, who was apparently also available to testify, called Price during the summer of 2002. According to the proffer, Price would have testified that Stevens called her to warn Lentz and Walters that Cochran was going to kill them and then commit suicide. The threat was apparently relayed to Walters.

The district court excluded the evidence after determining it was not relevant due to its remoteness. The Court of Appeals agreed: "Other death threats made by Cochran were already in evidence. The trial court did not err in excluding this remote, cumulative evidence." Slip op. at 11. As this court stated in *State v. Hernandez*, 253 Kan. 705, 714, 861 P.2d 814 (1993), " 'Determining whether evidence is too remote to be admissible rests within the sound discretion of the trial court. Mere lapse of time alone is not sufficient to deprive evidence of its probative value, but goes to the weight of the evidence to be considered by the jury.' [Citations omitted.]"

*Hernandez* discussed a similar issue. There, Hernandez was convicted of one count of second-degree murder and one count of unlawful use of a weapon for killing his brother-in-law, Randy. Hernandez' sister, Myra, was in the process of obtaining a divorce from Randy. At trial, Hernandez claimed self-defense and defense of another. Testimony indicated a history of abuse by Randy during the marriage. The district court, however, limited evidence of the relationship to the period 6 to 8 months before Randy's death. 253 Kan. at 714-15.

On appeal, Hernandez argued that the district court erred in limiting the evidence regarding the marital relationship. This court, however, concluded that the court's action was proper: "The marital discord during the six-to eight-month period before the killing was sufficient to present a complete defense and to provide a foundation for Hernandez's theory. We find no abuse of discretion in limiting the time frame." 253 Kan. at 715.

Here, Cochran's alleged threat occurred during the summer of 2002, while the shooting was in April 2003. Further, considerable evidence of more recent incidents where Cochran threatened both Lentz and Walters was allowed through their testimony. Under the rationale of *Hernandez*, the district court did not err in excluding this evidence.

*Evidence that Cochran had not been prosecuted for previous events.*

Finally, Walters argues that the district court erred in excluding evidence that Cochran had not been prosecuted for past crimes. Walters wanted to testify that "calling the police would not be helpful because Cochran 'was above the law'—he had been in trouble before, but was never charged with the previous criminal incidents because his father was a local judge who would posture to have the charges dropped." Slip op. at 11.

The specific incidents allegedly demonstrating Cochran's superior status included: (1) an arrest for drug possession when Cochran was in law school where charges were not filed; (2) an arrest for assault with a deadly weapon after a fight at a local bar where no criminal charges were filed; (3) a January 2003 arrest for selling methamphetamine; (4) an arrest after the "suicide standoff," where charges were not pursued; and (5) a May 2002 incident where Cochran ripped the door off of Lentz' mother's vehicle, but no charges were filed.

Walters asserts that the State "opened the door" to this line of questioning by highlighting his decision to not call the police and to instead shoot Cochran. He alleges this excluded evidence supports his decision to not call the police.

The Court of Appeals concluded that Walters failed to provide support for any of his "conclusory allegations." Slip op. at 11. Before this court, Walters again fails to show support for his contentions. Although he cites to the record where the argument was initially made, nothing in the record validates these allegations. See *State v. Holmes*, 278 Kan. 603, 612, 102 P.3d 406 (2004) (appellant has duty to designate record sufficient to establish claimed error). Accordingly, Walters' claim of error must fail.

Issue 2: *The exclusion of the evidence was not reversible error.*

Once error has been established, we next consider the magnitude of the error. As noted, the exclusion of evidence that is an integral part of a theory of defense may violate the fundamental right to a fair trial. *White*, 279 Kan. at 331. Walters argues that such an error implicates the constitutional harmless error inquiry. See *Chambers v. Mississippi*, 410 U.S. 284, 294, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.").

In *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), the Supreme Court established the standard: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt," or stated another way, that the error had little, if any, likelihood of having changed the result of the trial. See *Patton*, 280 Kan. 146, Syl. ¶ 16.

As discussed previously, self-defense includes both a subjective and objective test. *State v. Gonzalez*, 282 Kan. 73, 110-12, 145 P.3d 18 (2006). Here, Walters argues that the wrongly excluded evidence was important to show his honest and sincere belief that it was necessary to kill in self-defense and that his belief was reasonable.

Because Walters was convicted of voluntary manslaughter, an imperfect form of self-defense, the jury necessarily concluded that he held an honest belief that deadly force was necessary. See *Ordway*, 261 Kan. 776, Syl. ¶ 2. As the subjective component was therefore satisfied, the wrongly excluded evidence was not necessary to establish Walters' state of mind.

The jury also concluded, however, that Walters' belief was unreasonable based on the circumstances—the objective inquiry. This analysis involves evaluating the evidence proposed by Walters in light of the totality of the circumstances and making an assessment about the reasonableness of his belief that self-defense was necessary. *Gonzalez*, 282 Kan. at 112 (citing *Tyler*, 163 F.3d at 1228).

Here, in applying the totality of circumstances, we conclude that admission of the evidence would not have changed the jury's determination that a reasonable person would not have perceived the necessity of self-defense in Walters' situation. Cochran retreated to his Excursion after Walters fired a warning shot in the air. After Cochran got back into his Excursion, Walters shot and killed him. While Walters testified that he was afraid Cochran went to get a gun, he did not see Cochran with a gun before he fired. No one else saw any kind of weapon. Indeed, Walters and Bierman had never seen Cochran with a gun at any time.

Further, although Walters testified that the Excursion was not moving, he initially told the police that "Matt jumped in the vehicle and started to take off and that's when I shot." The law enforcement accident reconstructionist corroborated this statement, testifying that the Excursion's glass debris indicated the vehicle was in motion when Cochran was shot. Bierman testified the Excursion was moving when the shot was fired, as did Freeman, although he admitted that at the preliminary hearing he had testified the shot was fired and then the vehicle started moving.

Moreover, Walters himself had told Cochran several months before that if he stepped on Walters' property, he would shoot Cochran; told Bierman the evening of the shooting that he would shoot Cochran if Cochran came back on the property and started trouble; and told Lentz that evening that if Cochran returned, there were two options: they could call the police, or Walters could shoot him.

Finally, we observe that Walters had a closed circuit television security system; he simply could have stayed in his bedroom and observed his yard, eliminating the perceived need for shooting al-. together.

The judgment of the Court of Appeals affirming the district court is affirmed. The judgment of the district court is affirmed.

JOHNSON, J., not participating.

LOCKETT, J., Retired, assigned.