NOT DESIGNATED FOR PUBLICATION

No. 117,076

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DANIEL P. PARKER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Riley District Court; DAVID L. STUTZMAN, judge. Opinion filed December 8, 2017.
Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Barry K. Disney*, senior deputy county attorney, *Barry Wilkerson,* county attorney, and *Derek Schmidt,* attorney general, for appellee.

Before ARNOLD-BURGER, C.J., LEBEN and POWELL, JJ.

PER CURIAM: A Riley County jury convicted Daniel Parker of felony murder; the underlying felony offense was criminal discharge of a firearm. Parker was sentenced to life in prison without the possibility of parole for 20 years. After his direct appeal was denied, he filed a habeas corpus claim alleging ineffective assistance of counsel. He claimed that his trial attorney's representation had been deficient because the attorney didn't fully investigate the victim more and failed to keep Parker adequately informed before trial. The district court denied Parker's habeas claim after an evidentiary hearing.

Parker has appealed to our court, but we agree with the conclusions the district court reached in its detailed opinion. Specifically:

- Parker argues that his attorney should have more carefully investigated the background of the motorcycle club he shot at, suggesting this might have supported his view that he was threatened. But evidence of past acts of the victim aren't relevant unless the defendant knew of them when he committed the homicide. *State v. Walters*, 284 Kan. 1, 10-12, 159 P.3d 174 (2007). More investigation wouldn't have changed Parker's understanding or the trial outcome.

- Parker also argues that his attorney should have visited with him more than four times before trial so as to better prepare Parker to testify. Parker's main complaint seems to be that he wouldn't have testified as he did on a key point at trial. But his testimony was consistent with statements he had made to investigators and a psychologist—presumably to his attorney as well. And the testimony fit within the defense that was presented. So the attorney didn't provide inadequate representation by meeting with Parker only four times before trial.

We therefore affirm the district court's judgement.

FACTUAL AND PROCEDURAL BACKGROUND

Shortly after midnight on January 1, 2012, Daniel Parker was in a bar in Manhattan, celebrating the new year with his wife and friends. Also present at the bar were members of the Assassin Street Rydaz motorcycle club. Frederick Beverly, Jr., a member of the club and the eventual homicide victim, was also present.

A dispute arose between Parker and club members, but accounts differ as to its exact nature. Several witnesses claimed that the altercation was only verbal, but Parker said that he was shoved. Regardless, the altercation was quickly defused, and Parker and his wife left. They drove home to their apartment in Junction City, about 20 miles away.

When they arrived home, Parker stayed in the car while his wife went inside and to bed. It is unclear how long Parker sat in the car, but at some point, he left Junction City and drove back to the motorcycle club's clubhouse in Manhattan. Shortly after 4 a.m., Parker fired his AR-15 semi-automatic rifle in the direction of the clubhouse. He shot the weapon from the driver's seat of his car through the passenger window, firing between 20 and 27 times before fleeing the scene.

At the time, the Assassin Street Rydaz were hosting a party. Frederick Beverly, Jr. was standing outside the clubhouse entrance to check identification of party attendees and to enforce the club's no-weapons policy. When Parker fired his gun in the direction of the clubhouse, Beverly was struck in the forehead by a bullet—probably via a ricochet off a wall or fence. Despite life-saving efforts by bystanders and first-responders, Beverly died.

Investigators identified Parker as the shooter based on security-camera footage showing shots coming from a car later identified as Parker's, a match between bullet casings found at the scene of the crime, and Parker's rifle, cell-phone records, and Parker's own testimony. In a pretrial interview, Parker admitted to firing toward the clubhouse to send a threat but denied aiming at any person.

The State charged Parker with felony murder and criminal discharge of a firearm. At trial, Parker said that he was suffering from posttraumatic stress disorder and that this condition had affected his judgment. Parker argued that he developed the condition during his overseas military service, where he was exposed to combat situations. Evidence tended to show that this experience and the ensuing disorder affected his ability to reasonably assess threats. He said this caused him to perceive the motorcycle club as an imminent threat following the initial altercation at the bar and that his gunfire at the clubhouse was a form of self-defense.

3

Parker attempted to persuade the jury that he was guilty of a lesser offense, such as voluntary manslaughter, rather than felony murder. But the jury found him guilty of felony murder and criminal discharge of a firearm. He was sentenced to 20 years to life in prison.

After his direct appeal was denied by the Kansas Supreme Court in *State v. Parker*, 301 Kan. 556, 344 P.3d 363 (2015), Parker filed this habeas corpus action under K.S.A. 60-1507. In it, he argues that his trial attorney was so deficient he was effectively denied a fair trial. The district court held an evidentiary hearing on the motion, but neither side presented testimony from Parker's trial attorney.

Parker argued that his attorney was ineffective in two main ways. First, he says his trial attorney failed to adequately investigate the nature of the Assassin Street Rydaz motorcycle club, and that doing so would have revealed more about its violent nature. Parker says evidence of that sort would have supported his self-defense argument. Second, Parker complains that his trial attorney only met with him about four times prior to trial. In Parker's view, this demonstrated a lack of planning on the part of his counsel and left Parker unprepared for his trial testimony. Parker argues that he would have delivered less incriminating testimony on the witness stand had he better understood the nature of the crimes for which he was charged.

The district court denied Parker's motion on both grounds. The judge determined that Parker's attorney had acted reasonably when he did not further develop the self-defense line of argument at trial, noting that several hours had elapsed between the altercation at the bar and the shooting. The district court also determined that Parker's trial strategy would have been substantially the same had Parker's attorney spent more time reviewing the case prior to trial. The court noted that the limited communication was "minimal to inadequate for the purpose of client satisfaction," but the court found it

4

within the bounds of reasonable conduct in preparation for trial. And regardless, the judge determined that—even if Parker's attorney had proceeded in the way in which Parker now says he should have—the outcome of the trial would not have been different, given the substantial evidence weighing against Parker.

Parker timely appealed to our court.

ANALYSIS

Parker has two broad grievances with his trial attorney: (1) that his attorney failed to properly investigate the facts and circumstances around his crime; and (2) that his attorney did not adequately prepare him for trial. He says these alleged errors were so egregious that he was effectively denied a fair trial. But the trial court properly found that neither allegation constituted ineffective legal representation. And even if they were, the alleged errors weren't harmful enough to change the outcome of his case.

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This right to counsel is applicable to proceedings in Kansas state courts under the Fourteenth Amendment. *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014). The guarantee includes the right to more than the mere presence of an attorney but also that the attorney act with some minimum level of competence. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). "The purpose of the effective assistance guarantee 'is simply to ensure that criminal defendants receive a fair trial.'" *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012) (quoting *Strickland*, 466 U.S. at 689).

When the district court conducts a full evidentiary hearing on an ineffective–assistance-of-counsel claim—as it did in this case—we must first determine whether the

district court's findings are supported by substantial evidence and then determine whether the factual findings support the court's legal conclusions. While we must accept the district court's factual findings (to the extent they are supported by substantial evidence), we review its ultimate legal conclusion independently, with no required deference to its ruling. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

Both in the district court and here, review of counsel's performance is highly deferential and requires consideration of all the evidence. This means that we must start with the presumption that the conduct of Parker's trial attorney fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). It is Parker's burden to overcome this presumption. *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007).

So to prevail, Parker needed to establish: (1) that his trial attorney's work was below minimum standards and thus constitutionally deficient; and (2) that the attorney's substandard work prejudiced the defense. *Mattox v. State*, 293 Kan. 723, Syl. ¶ 1, 267 P.3d 746 (2011). The defendant's case is prejudiced under this standard if there is a reasonable probability that the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland*, 466 U.S. 668).

Under this test, Parker's two claims about his trial counsel—a failure to investigate and a failure to communicate—must each be analyzed for deficiency. But even if Parker shows his attorney provided inadequate legal representation, Parker must still show prejudice: that the jury would have ruled differently if not for his attorney's mistakes. Because he can meet neither requirement, Parker's motion was properly denied in the district court.

6

*Failure to Investigate*

Parker first argues that his attorney should have conducted further investigation, specifically about the Assassin Street Rydaz. Parker says this evidence would lend credence to his claim that he acted in self-defense when he shot at the clubhouse. But we do not find that to be the case.

Parker's attorney employed a guilt-based defense at trial. Instead of attempting to prove Parker was innocent, he asked to jury to convict Parker of a lesser crime than felony murder, like involuntary manslaughter. The theory developed at trial was that Parker's culpability for the crime was lessened because he was suffering from posttraumatic stress disorder. Evidence was presented that tended to show Parker had difficulty assessing threats because of his disorder. Parker now says a further assessment of the motorcycle club would have vindicated his belief that he was acting in self-defense when he fired on the clubhouse.

But when asked at the habeas hearing what he hoped an investigation would reveal, Parker referenced "basic stuff" about background facts that might show the members not to be "model citizens":

> "I mean kind of basic stuff. You know[,] are these guys really model citizens like they are being portrayed as[?] I mean stuff like that, their background, who has been investigated. I mean how many of them actually even own motorcycles. It is just basic stuff."

A key problem with the self-defense argument is that the relevant state of mind for a self-defense claim was Parker's mental state *at the time* he allegedly acted in self-defense. Past evidence of the bad acts of the victim is not relevant to a self-defense claim unless the defendant knew of the bad acts when he committed the homicide. *State v.*

7

*Walters*, 284 Kan. 1, 10-12, 159 P.3d 174, (2007). So if Parker didn't know about the motorcycle club's (alleged and unproven) violent tendencies at the time of the shooting, any such evidence is irrelevant. Even if Parker's attorney had investigated and found evidence of violent past acts, this would not have helped Parker unless he knew of the acts at the time of the shooting. And Parker makes no claim that he had such knowledge.

Nor do we see how this information would have supported a self-defense theory, anyway. To support such a claim, Parker would need to show that he held a *reasonable* belief that the shooting was necessary to prevent imminent death or great bodily harm. See *State v. Bellinger*, 47 Kan. App. 2d 776, Syl. ¶ 4, 781-82, 278 P.3d 975 (2012). Following the altercation at the bar, however, Parker left with his wife, drove 20 miles to his home, sat for some length of time, and then drove 20 miles back to Manhattan to shoot at the clubhouse. At least an hour and a half elapsed between the altercation and the shooting. And even assuming the altercation at the bar was physical, it was unreasonable for Parker to think the shooting was necessary to prevent harm to himself.

Parker also argues on appeal that his trial attorney should have pursued another theory of defense called imperfect self-defense. In contrast with pure self-defense, this means an unreasonable, but honest belief that the shooting was necessary to prevent imminent death or great bodily harm. *State v. Salary*, 301 Kan. 586, Syl. ¶ 5, 343 P.3d 1165 (2015). Parker says that his posttraumatic stress disorder, combined with the violent nature of the motorcycle club, would support an imperfect self-defense theory.

That might have seemed a closer factual fit to what happened here since there's no good argument that Parker had a reasonable belief that the shooting was necessary to protect against an imminent threat. But there's a legal problem: there is no imperfect self-defense to criminal discharge of a firearm at an occupied dwelling, which was the charge against Parker. A claim of imperfect self-defense cannot serve to render the evidence of the underlying felony of criminal discharge of a firearm weak, inconclusive, or

8

conflicting. *State v. Kirkpatrick*, 286 Kan. 329, 340, 184 P.3d 247 (2008) ("There is no imperfect self-defense version of criminal discharge of a firearm at an occupied dwelling."), *overruled on other grounds by State v. Sampson*, 297 Kan. 288, 301 P.3d 276 (2013). Additionally, as the Kansas Supreme Court noted this fact in Parker's direct appeal, a statutory change made before Parker's trial provided that there would no longer be any lesser-included offenses to a felony-murder charge. *Parker*, 301 Kan. at 566. Imperfect self-defense would not have helped Parker.

Parker's attorney was not deficient when he did not pursue more evidence supporting theories of self-defense or imperfect self-defense.

*Failure to communicate*

Parker also claims his attorney was ineffective because they met no more than four times before the trial. Parker said he did not understand the strategy employed in his defense, and that as a result he gave incriminating testimony on the stand.

There is no bright-line rule telling us how much time an attorney must spend preparing a case for trial—or, in our case, how much time the attorney must spend meeting with the defendant to prepare for trial testimony. Parker cites a case similar to his in which the attorney, whose representation was deemed constitutional, spent about eight hours meeting with the defendant. *State v. Betancourt*, 301 Kan. 282, 307-08, 347 P.3d 916 (2015). Parker implies that his attorney should have at least done the same. But this is not a minimum standard; instead, the relevant inquiry is whether Parker's attorney adequately prepared him for his defense.

Parker's main complaint is his lack of understanding of the felony-murder rule at the time of the trial. Parker told investigators prior to the trial that he shot at the building to send a message to the motorcycle club after their altercation earlier in the night. He

9

told a psychologist—who later testified about Parker's mental condition—that he was shooting at the building, and even drew a diagram explaining where he aimed. And Parker stated the same fact at trial.

But at the habeas hearing, he said this wasn't true:

"And you know if he would have told me that you know that was—I want to say a felony in itself, you know I wouldn't have put myself under the gun. Um, because honestly, I don't recall what I was shooting at. I just—I figure the safe bet was to say hey, I'm shooting at something hard, because my intention was not to harm anyone."

Parker essentially says that, had his attorney spent more time with him prior to trial, he would have testified that he had a different intent when he shot the gun. But Parker's attorney was apparently presenting the facts to the court as he knew them—as Parker had told them to investigators and presumably also to his attorney. This is no basis for ineffective legal representation.

On both allegations of ineffective assistance of counsel—a failure to warn and a failure to communicate—Parker has failed to show that his attorney's performance fell below constitutionally required minimum standards for legal representation.

*Prejudice*

Even if Parker had demonstrated deficient performance by his attorney, he can show no prejudice from the aspects of that representation that he now criticizes. That's because even if Parker's attorney had proceeded as Parker now says he should have, there is no reasonable probability that the jury would have reached a different outcome.

Parker's failure to investigate argument is essentially that his trial attorney did not properly develop the theme of his posttraumatic stress disorder and his unreasonable belief in the necessity of self-defense as mitigating factors in the shooting. But it was, in fact, extensively explored at trial. Parker's attorney arranged for a brain scan on Parker, and had him evaluated by a clinical psychologist. Parker's mother and wife both testified at the trial. And Parker himself took the stand. All these witnesses spoke of Parker's disorder and its effects on his mental state. The jury heard this evidence, and apparently chose to reject it. Further evidence in the same vein is unlikely to have been helpful to Parker's cause.

The alleged failure to communicate is similarly not prejudicial. Parker says he would not have admitted on the stand to the elements of felony discharge of a firearm if he had been better prepared. But if this is true, the real error was Parker's in telling a different story to investigators—and presumably also to his attorney—before trial. If Parker had said then, as he does now, that he was firing randomly, perhaps his attorney would have proceeded differently. Regardless, Parker cannot point to his own error and say it was his attorney's.

Parker does not show that his attorney acted deficiently. And even if he had, we find no reasonable probability that the trial's outcome would have been different: the Kansas Supreme Court correctly noted on Parker's direct appeal that "overwhelming evidence establish[ed] Parker's guilt for felony murder." 301 Kan. at 557.

We affirm the district court's judgment.

11