NOT DESIGNATED FOR PUBLICATION

No. 116,111

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

FREDDIE ALEC THOMAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Barton District Court; RON SVATY, judge. Opinion filed December 8, 2017. Reversed and remanded with directions.

*Douglas A. Matthews*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Donald E. Anderson II*, of Robert A. Anderson Law Office, of Ellinwood, for appellee.

Before BUSER, P.J., PIERRON and STANDRIDGE, JJ.

BUSER, J.: The State charged the defendant, Freddie Alec Thomas, with murder in the first degree after he shot and killed Jeremy Saldana as the victim was returning to his residence in Great Bend, Kansas. After a preliminary hearing and Thomas was bound over for trial on the charge, Thomas filed a motion to dismiss claiming he acted in self-defense and, therefore, was immune from prosecution. After an evidentiary hearing, the Barton County District Court found that Thomas was immune from prosecution due to self-defense and granted the motion to dismiss the complaint. The State appeals.

1

We hold the district court did not make findings resolving controverted facts that are material to analyzing the self-defense issue, and the district court also did not correctly apply the law regarding self-defense. Accordingly, we reverse the grant of immunity and dismissal of the charge and remand with directions to conduct a rehearing on the motion, and upon consideration of the evidence presented at the rehearing, to make findings of fact and conclusions of law on all matters necessary to rule on the self-defense and immunity issues.

FACTUAL AND PROCEDURAL BACKGROUND

The factual summary provided in this section is derived from the evidence presented to the district court at the hearing on the motion to dismiss which occurred on June 8, 2016. The procedural background is taken from the record on appeal.

On the morning of September 11, 2015, Marissa Reynolds and her husband, Jason, invited Sherry Muro and her boyfriend, Thomas, to their home in Great Bend. Sherry is Marrissa's mother. Of note, until 2013, Sherry had dated Saldana for about a year, but at the time of the shooting she was in a dating relationship with Thomas. Unbeknownst to Sherry and Thomas, Saldana was living at the Reynolds residence, and had been living there for the past two years. According to Marissa, Saldana was a member of the family, and she "considered him to be my father." Marissa testified that because Saldana "just didn't want to create any drama [and] didn't care to see either [Sherry or Thomas]," he left the residence in the late morning before the couple arrived, and he did not return to the home until later in the evening.

By all accounts, Saldana had never met Thomas. According to Marissa, she was unaware of any animosity between the two men. She testified, "[i]t was my belief that they had never met and never talked, and [Saldana] had always told me he wanted nothing to do with . . . Thomas, so he didn't even want to talk to him . . . didn't want to

2

even see him." Sherry testified, however, that she previously had conversations with Thomas in which she advised him that Saldana made racially disparaging remarks about her dating a black man.

Thomas was employed by the Kansas Department of Corrections at the Ellsworth Correctional Facility. According to Marissa, he was a member of the SWAT team. During his stay at the Reynolds residence, as was his custom and practice, he wore a nine millimeter Ruger semiautomatic handgun as a sidearm.

Sometime after 1 p.m., Sherry and Thomas arrived at the Reynolds residence. The two couples left for dinner and returned to the residence about mid-to-late afternoon. Upon returning home, the two couples lounged about the residence and backyard. Thomas drank beer.

Marissa testified that, later in the evening, Saldana sent text messages to her expressing his intent to return home. These texts stated, "[t]hat he was tired. He wanted to come home. He asked me if I could ask Sherry and Thomas to leave." In the late evening hours, about 8 p.m., Marissa informed Sherry and Thomas of the texts. According to Marissa, "[Sherry] seemed shocked that [Saldana] lived there, and Thomas was a little upset. Don't ask me why. I don't know, but she convinced him to leave."

Sherry, on the other hand, testified that during the evening Marissa was texting Saldana and that she "was acting kind of funny." According to Sherry, Marissa eventually disclosed that Saldana was "over in the park and that he was going to come and start some shit with Mr. Thomas." Sherry testified that she and Thomas went outside to his silver Toyota 4Runner, and began packing it up with a beer cooler but they did not drive away. Instead, she stood in the front yard and spoke to her daughter because she was angry at Marissa for not telling her that Saldana lived at the residence.

3

According to Marissa, as she stood on her front porch, she observed her mother and Thomas leave the home. At this time, Thomas was "riled up," and "ask[ed] what [Saldana] looked like." Thomas walked to his vehicle parked in front of the residence, rummaged around, and "took out a bulletproof vest [and] put it on." The vest had a badge-like emblem with "Kansas Department of Corrections" and the name "Thomas" sewn on the front. After the shooting, it was found next to the front porch.

Marissa testified that she saw her mother and Thomas get in their vehicle and start to drive away when Saldana was walking from the park across the street and toward the residence. Marissa then observed Thomas stop his vehicle and get out as Saldana walked diagonally onto the front yard towards the front door of the Reynolds' residence. According to Marissa, Thomas then walked onto the front lawn and he "cut [Saldana] off."

Although Thomas did not testify at the motion hearing, Detective David Paden conducted two interviews with Thomas after the shooting. The first interview occurred at the sheriff's office shortly after Thomas' arrest and after he waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The second interview took place on September 15, 2015. During those two interviews, Thomas described his version of the events of September 11, 2015.

According to Thomas, prior to the shooting he knew that Saldana was Sherry's ex-boyfriend but he had never met or seen him. Thomas told Detective Paden, that in the afternoon, he was at the Reynolds' home watching a movie.

> "There was a point in time where he was informed that [Saldana] was going to be coming back, so they were going to leave. But he was told no, just hang on, just wait, don't leave. [Thomas] said he didn't want to be the bad guy. He was trying to kind of be a go-between

4

between Marissa and [Sherry], so he didn't want to be the bad guy, so they decided to stay.

. . . .

". . . just stay and work things out."

Thomas stated that when he left the home he entered his vehicle and retrieved a protective vest which he put on. According to the detective, Thomas advised, "He didn't know what was going to go on. It was his information that Mr. Saldana was a violent man, that had carried weapons, and he didn't know what was going to happen when Mr. Saldana got on scene." At that time, Thomas also wore the nine millimeter Ruger semiautomatic handgun as a sidearm.

As he was standing outside his vehicle, Thomas was "told basically just, here he is, look at him, look at him. He's right here." As Thomas was coming around his vehicle and walking onto the Reynolds' front yard, "[h]e said he turned to his right, and Mr. Saldana was right there in front of him."

Thomas described a "very quick encounter." He told Detective Paden

"he wanted Saldana to know that he had a firearm on him, and he said what's—'What's the problem?' He said Saldana said something. He didn't know if it was in Spanish or what. He didn't understand it, but then Saldana kept coming at him, so he did a clearing maneuver, pushed him back, and then he stepped back and drew his weapon."

There was no testimony by Detective Paden about what Thomas meant by the term "clearing maneuver" but the detective described a clearing maneuver as an action, "taught in law enforcement training to basically separate yourself from a suspect to—so you can gain some time to decide what your next move is going to be."

Other than the clearing maneuver, Thomas said there was never any pushing, shoving, punching, or scuffle of any kind by either him or Saldana prior to Thomas firing the first shot. According to Thomas, the first shot he fired was an accident. He informed Detective Paden, "The gun just went off. It was—he didn't mean for it to. It went off." Thomas then advised, "Mr. Saldana was still coming at him, so he fired two more shots" while his arm which held the firearm was straight out.

Thomas advised that at the time of the encounter he did not know if Saldana would go inside the residence or do anything to anybody else. Thomas indicated "[h]e was concerned for his safety and anybody else's." Thomas acknowledged, however, that during the encounter he never saw Saldana with a weapon.

Marissa provided a markedly different account. As she watched from inside her front screen door, the two men were facing each other about two feet from the front porch. Saldana was facing the front door and Thomas was facing away from the residence towards the park. Saldana was holding a large Kwik Shop cup.

As Marissa described the encounter: "The only thing I heard come from . . . Thomas' mouth was, 'Do you have a beef with me?' [Saldana], to my knowledge, said nothing. I couldn't hear nothing. Mr. Thomas proceeded to grab him by his throat." As described by Marissa, "As Thomas had grabbed [Saldana] by the throat and when he had turned, [Saldana] more like violently swung him, the cup had fell [*sic*] from his hand." Marissa did not see any pushing, shoving, or hitting by Saldana, only that "he was trying to shove Mr. Thomas away so that he could get away" while Thomas had him by the throat. According to Marissa, Thomas let go of Saldana's throat then "stepped back, unholstered his weapon and shot [Saldana]." She estimated that the two men were less than an arm's length from each other at the time of the shooting.

6

Marissa testified that after the first shot, Saldana was "like staggering from the gunshot wound, and the second to third shot he was midway down to the ground," falling backwards. Marissa unsuccessfully attempted CPR in an attempt to revive Saldana.

Sherry's version of the encounter differed from both Marissa and Thomas' accounts. Sherry denied that she and Thomas began driving from the residence as Saldana entered the front yard. Rather, at the time she saw Saldana coming into the yard, she said Thomas was "standing in the yard and [Saldana] just kept coming at him. . . . [Thomas] was standing . . . at the edge of the porch, and [Saldana] kept coming at him." According to Sherry, she attempted to physically separate the two men. She believed that Saldana was "going to attack [Thomas]."

Sherry saw Saldana push Thomas whereupon Thomas "put his hand out and told [Saldana] to stop" but he kept coming toward Thomas. Sherry heard Saldana say "something along the line of, 'What is your fucking problem?'" to which Thomas replied, "I don't have no problem, stop." Sherry testified that both men were asking each other what the problem was. According to Sherry, "When [Saldana] kept coming, [Thomas] used his left hand because he pulled his gun with his right hand, and he just kept coming, and I heard the first shot." Sherry saw that after being shot, Saldana's shoulder moved backward but he continued to move forward towards Thomas. Sherry then saw Thomas fire his weapon again. She only heard two shots.

In response to the prosecutor's question, "So in order to go to the porch, Mr. Saldana would have had to have gone through Mr. Thomas, correct?" Sherry responded, "He could have gone around [Thomas] without shoving him, yes." She did not see Saldana armed with any weapon.

7

At the hearing on the motion to dismiss, the State advised the district court that Saldana had prior misdemeanor theft convictions from San Angelo, Texas, and a 2006 conviction for misdemeanor assault with bodily injury from the same jurisdiction.

At about 8:30 p.m. on September 11, 2015, Great Bend Police Officer Mason Paden was dispatched to the Reynolds residence. Upon arrival at the scene two minutes later, the officer observed Saldana laying in the front yard surrounded by bystanders. In response to his questions, "What happened? Who did this?" Thomas replied, "I did." Thomas then placed his hands behind his back and was arrested. Thomas informed Officer Paden that the firearm was on a trunk of a car. The weapon, a nine millimeter Ruger semiautomatic handgun with one live round in the magazine was seized. Of note, three spent shell casings were found within a foot or two of Saldana's body. A large Kwik Shop cup was also found nearby.

The report of the autopsy conducted on Saldana's body was admitted in evidence. It is noteworthy that, based on the examination of the paths of the bullet wounds at autopsy, the sequential order that the bullets penetrated Saldana's body was determined. According to Dr. Lyle Noordhoek, the deputy coroner who performed the autopsy: "The first gunshot wound passes through the right side of the shirt through the right chest . . . into the right lung, out of the posterior right lung, into the right posterior chest and exits . . . a through-and-through perforation." According to Dr. Noordhoek, "the wound in the right anterior chest appears to be the first wound as it is nearly level in anteroposterior penetration with slight lateral deviation and slight downward deviation."

Based on Dr. Noordhoek's examination: "The second gunshot goes through the left anterior chest near the clavicle, passes through a portion of the anterior clavicle . . . passing through the chest wall through the left lung, through the lateral aorta and exiting the left posterior chest in a lateral and downward direction. . . . The bullet is recovered." The doctor memorialized that "[t]here is a gaping hole in the aorta." Based on his

8

examination, Dr. Noordhoek opined that "[t]he individual appears to have been moving forward at the time of this wound tract."

The third gunshot wound "passes through the left temporal skin in a downward and medial direction anterior to the left ear." The jacket and bullet were recovered from the anterior neck skin. Dr. Noordhoek opined, that Saldana "would be leaned forward at the time of the wound."

In summary, Dr. Noordhoek determined the manner of Saldana's death was homicide with the cause of death as "hemopneumothorax and exsanguination due to, or as a consequence of gunshot wounds to the right and left chest with penetration of the right and left lungs and perforation of the lateral aorta."

On September 16, 2015, Thomas was charged with premeditated murder, an off-grid person felony, in violation of K.S.A. 2015 Supp. 21-5402(a)(1). (I, 1) After a preliminary hearing, Thomas was bound over for arraignment and trial as charged in the complaint. He was arraigned promptly after the ruling.

On May 23, 2016, Thomas filed a "Motion to Dismiss the State's Complaint/Information Due to Defendant's Immunity from Prosecution." The motion sought immunity from prosecution as provided in K.S.A. 2015 Supp. 21-5231. In particular, Thomas based his immunity claim on self-defense, as set forth in K.S.A. 2015 Supp. 21-5222.

The evidentiary hearing on Thomas' motion to dismiss occurred on June 8, 2016. At the conclusion of the hearing the district court made no factual findings. However, the district court concluded as a matter of law that immunity from prosecution was warranted because the killing of Saldana was justified by Thomas acting in self-defense. As a result, the complaint was dismissed and Thomas was discharged from prosecution.

9

The State filed a timely appeal.

STANDARDS OF REVIEW AND SUMMARY OF THE APPLICABLE LAW

After the filing of appellate briefs but prior to oral arguments, our Supreme Court issued its opinion in *State v. Hardy*, 305 Kan. 1001, 390 P.3d 30 (2017). In this opinion, the Supreme Court reversed our court's judgment in *State v. Hardy*, 51 Kan. App. 2d 296, 347 P.3d 222 (2015). This development is significant because at the district court hearing and in the parties' appellate briefing, our court's exposition on the law and procedure of Kansas' self-defense immunity statutes was cited and applied to the facts of this case. In the view of our Supreme Court, however, there were certain errors of law in our court's holding. As a result, in this appeal, we must follow the Supreme Court's directives regarding the proper law and procedure to be applied in self-defense immunity cases. See *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015) (The Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position.). Of note, shortly before oral arguments in this case, the State filed a letter of additional authority in accordance with Kansas Supreme Court Rule 6.09(b) (2017 Kan. S. Ct. R. 39) alerting our court and Thomas to the Supreme Court's opinion in *Hardy*.

Given the importance of our Supreme Court's guidance in *Hardy*, we begin by citing two syllabi in that opinion that pertain to the law and procedure that district courts and appellate courts, respectively, should follow in self-defense immunity cases:

> "Upon a motion for immunity pursuant to K.S.A. 2016 Supp. 21-5231, the district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified."
>
> . . . .

10

"An appellate court will apply a bifurcated standard of review to a district court's determination of probable cause pursuant to K.S.A. 2016 Supp. 21-5231. When a district court's ruling entails factual findings arising out of disputed evidence, a reviewing court will not reweigh the evidence and will review those factual findings for supporting substantial competent evidence only. The ultimate legal conclusion drawn from those facts is reviewed de novo. When there are no disputed material facts, a pure question of law is presented over which an appellate court exercises unlimited review." 305 Kan. 1001, Syl. ¶¶ 1, 5.

Having summarized the standards of review which guide Kansas district courts and appellate courts, we next set forth the applicable statutes relating to self-defense and immunity from prosecution.

An individual's right to use deadly force in defense of that person is provided in K.S.A. 2016 Supp. 21-5222:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

"(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

Of particular relevance to this appeal, is subsection (b) relating to the use of deadly force in those circumstances wherein an individual *reasonably believes* that the use of deadly force is necessary to prevent *imminent death or great bodily harm* to that person.

11

Our Supreme Court has developed a two-prong test to determine whether a defendant's conduct was reasonable. The first, *subjective* prong of this test "requires a showing that [the defendant] sincerely and honestly believed it was necessary to kill [or cause great bodily harm] to defend [himself]." *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 (2012). The second, *objective* prong of this test "requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary." 293 Kan. at 975. In other words, the critical consideration regarding the objective prong is "the reasonableness of [the defendant's] belief that self-defense was necessary." *State v. Walters*, 284 Kan. 1, 16, 159 P.3d 174 (2007).

Self-defense is limited by K.S.A. 2016 Supp. 21-5226, which provides, in part, that the justification is not available to a defendant who

"(a) Is attempting to commit, committing or escaping from the commission of a forcible felony;

"(b) initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or

"(c) otherwise initially provokes the use of any force against such person or another, unless:

"(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

"(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force."

Moreover, a defendant does not need to initiate physical contact with the victim for an initial aggressor finding to be appropriate. See *State v. Salary*, 301 Kan. 586, 593-94, 343 P.3d 1165 (2015).

12

Kansas' immunity statute, K.S.A. 2016 Supp. 21-5231, among other provisions, provides immunity from prosecution for any individual, pursuant to K.S.A. 2016 Supp. 21-5222, who uses deadly force in defense of the person upon the belief that use of deadly force is necessary to prevent imminent death or great bodily harm. That statute provides:

"(a) A person who uses force which . . . is justified pursuant to K.S.A. 2016 Supp. 21-5222, . . . and amendments thereto, is immune from criminal prosecution and civil action for the use of such force . . . . As used in this subsection, 'criminal prosecution' includes arrest, detention in custody and charging or prosecution of the defendant.

"(b) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (a), but the agency shall not arrest the person for using force unless it determines that there is probable cause for arrest.

"(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause." K.S.A. 2016 Supp. 21-5231.

Considered together in this case, the self-defense and immunity statutes would afford Thomas immunity from prosecution if he was not the initial aggressor and only used deadly force upon a reasonable belief that such force was necessary to prevent imminent death or great bodily harm to his person as a result of Saldana's actions. See K.S.A. 2016 Supp. 21-5226; K.S.A. 2016 Supp. 21-5222(a), (b); K.S.A. 2016 Supp. 21-5231(a). Because Thomas sought self-defense immunity for his use of deadly force in killing Saldana, the State had the "burden to establish probable cause that the defendant's use of force was not statutorily justified." *Hardy*, 305 Kan. 1001, Syl. ¶ 1.

THE ABSENCE OF FACTUAL FINDINGS BY THE DISTRICT COURT

On appeal, the State and Thomas are in agreement on one thing:  The material facts relevant to the issue of self-defense are undisputed and the district court made sufficient findings regarding those facts. According to the State:  "There are no disputed

13

material facts from the trial court hearings. This honorable Court can consider this case to be a matter of a question of law and exercise unlimited review." For his part, Thomas asserts: "The court made a detailed ruling of its findings on the record." Thomas does acknowledge: "Though there were certainly discrepancies in the testimony between Mr. Saldana's friend/roommate, [Marissa], and the defendant's girlfriend, [Sherry], the court still made the ruling it did based on the evidence presented to it that was not in conflict . . . ."

We could not disagree more. At the outset, our review of the district court's ruling at the conclusion of the evidence and the later filed journal entry, reveals the district court made *no findings* regarding any of the facts presented at the evidentiary hearing. While this circumstance frustrates appellate review, in this particular case the absence of judicial fact-finding is especially troubling because there was considerable disputed evidence critical to a determination of the self-defense issue. A few examples:

- The evidence was disputed regarding whether Thomas stopped his vehicle, got out, and walked into the yard to intercept and confront Saldana who was walking towards the front door of his residence; or whether Saldana arrived home while Thomas was merely standing in the front yard waiting to leave.

- The evidence was disputed regarding whether—other than Thomas' clearing maneuver—there was any physical contact prior to the shooting by either Saldana or Thomas. In this regard, Marissa and Sherry's testimony was not only at odds with each other, but also at variance with Thomas' statements to Detective Paden denying any physical contact—other than the clearing maneuver—by the two men prior to the shooting. Additionally, it is unclear whether the clearing maneuver admitted to by Thomas was observed by Marissa to be Thomas grabbing Saldana by the throat.

14

- The evidence was disputed regarding what, if anything (including fighting words), Saldana or Thomas said to each other prior to the shooting. Once again, the controverted testimony came from Marissa, Sherry, and Thomas' statements to Detective Paden.

- The evidence was disputed regarding the circumstance leading up to and including the shooting of Saldana. While Marissa testified that three shots were fired—a number corroborated by autopsy—Sherry heard only two shots. Moreover, in Thomas' motion to dismiss he asserted that he had fired an initial warning shot, although Thomas twice told Detective Paden that his first shot was not intentional but accidental.

We pause to emphasize the importance of judicially determining the truth of these aforementioned disputed facts which immediately preceded the shooting. For example, in the State's view, Thomas "must be seen as the aggressor, since he was already armed, donned the vest, refused to leave the area when given an opportunity to do so, and re-entered the yard in order to approach [Saldana]." In short, the State views Thomas as the initial aggressor. And, as noted earlier, if Thomas was the initial aggressor, he may not claim self-defense.

In sum, given the controverted facts leading up to the shooting, the importance of the district court's factual findings regarding what actually occurred is critical to determining whether Thomas was the initial aggressor or whether he was able to lawfully claim self-defense.

With regard to the manner of the shooting, whether the first shot was a warning shot intended to scare Saldana, an accident, or an intentional act is a material fact that is relevant to the self-defense analysis. Our court has stated that self-defense requires the *intentional*, *not accidental* use of force. See *State v. Bradford*, 27 Kan. App. 2d 597, Syl.

15

¶ 4, 3 P.3d 104 (2000) ("Self-defense is the intentional use of reasonable force to fend off an attacker."); *State v. Jones*, No. 113,044, 2016 WL 852865, at *6 (Kan. App. 2016) (unpublished opinion) (same). On the present record, we can only speculate regarding how the district court resolved these conflicting shooting scenarios.

Finally, it is understatement to observe that resolution of the aforementioned disputed facts is also important to the analysis of whether there was a subjective and objective basis for Thomas to have a reasonable belief in the necessity of using deadly force to prevent imminent death or great bodily harm at the hands of Saldana. See K.S.A. 2016 Supp. 21-5222(b).

The failure of the district court to make any factual findings in ruling on Thomas' motion to dismiss is consequential. Supreme Court Rule 165 (2017 Kan. S. Ct. R. 214) imposes on the district court the primary duty to provide adequate findings of fact and conclusions of law on the record to explain the court's decision on contested matters. *State v. Herbel*, 296 Kan. 1101, 1119-20, 299 P.3d 292 (2013). When, as in this case, no objection is made to a district court's inadequate findings of fact or conclusions of law, an appellate court may presume the district court found all facts necessary to support its judgment. *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015). Where, however, the record does not support such a presumption and the lack of specific findings precludes meaningful review, an appellate court can consider a remand. *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014).

We are unwilling as an appellate court to act as a fact-finder in this matter. It is not our role to weigh conflicting evidence, evaluate from afar witness credibility, ascertain which witness has a better memory or simply decide which testimony was more convincing. See *State v. Jones*, 300 Kan. 630, 646, 333 P.3d 886 (2014) ("We agree with Judge Buser's view that it would be inappropriate for us or any appellate court to make the factual finding and resolve a disputed point."); *State v. Berriozabal*, 291 Kan. 568,

16

591, 243 P.3d 352 (2010) (appellate court only reviews factual findings made by district court; it does not make findings).

Given the importance and large number of disputed facts which have not been judicially determined but are critical to a proper resolution of the self-defense question, we have no hesitancy in remanding this matter to the district court for compliance with Supreme Court Rule 165.

THE DISTRICT COURT'S CONCLUSIONS OF LAW

Next, we exercise unlimited review over whether the district court rendered proper conclusions of law when it ruled that the State had not carried its burden to establish probable cause that Thomas' use of force was not statutorily justified. See *Hardy*, 305 Kan. 1001, Syl. ¶¶ 1, 5.

As previously discussed, K.S.A. 2016 Supp. 21-5222(b) generally provides that a person is justified in the use of deadly force against another when and to the extent it appears to that person and the person reasonably believes that use of deadly force is necessary to prevent imminent death or great bodily harm. In this case, although the circumstances leading up to and involving the shooting were controverted, it was undisputed that Thomas used his deadly weapon to shoot and kill an unarmed Saldana. As a result, the essential legal question before the district court was whether Thomas' use of deadly force was based on a reasonable belief that his use of the firearm was necessary to prevent imminent death or great bodily harm.

As summarized earlier, we apply a two-prong test, comprised of a subjective component and an objective component, to evaluate whether a defendant's use of deadly force was reasonable under the totality of circumstances.

17

With regard to Thomas' subjective belief in the need to defend himself with deadly force, in the district court Thomas argued:

> "Mr. Thomas felt threatened by the conduct of the victim. Mr. Thomas knew of threats that Mr. Saldana had previously made against him and had been told that he had a violent criminal history. During that actual incident Mr. Thomas tried on multiple occasions to push the victim back and keep the victim from his person, but the victim kept coming at Mr. Thomas."

As to the first prong—Thomas' subjective belief that the use of deadly force was necessary—the district court found Thomas had a subjectively reasonable belief that deadly force was necessary. According to the district court, this conclusion of law was based on one important fact:

> "[C]ontrary to the State's argument that putting on a vest is somehow an affirmative action for going after somebody, in this case particularly, it showed that the defendant was—sincerely and honestly believed the use of deadly force was necessary because he had a gun on from the time he went to visit his wife's—or his girlfriend's family. He wore it all the time. The only thing he goes to the car for is the bulletproof vest, which is not an affirmative action to go do something to somebody else. It's an action to defend yourself. Now so the subjective test I don't think the State could overcome."

The State contests this ruling and argues there was not enough evidence for the district court to find that Thomas had "reason to believe that the use of deadly force was necessary to prevent great bodily harm or death to either himself or anyone else." The State highlights the evidence that Thomas "did not see Saldana with a weapon [and] did not physically fight with him," and suggests that these facts alone "defeat[ed] the defendant's subjective beliefs."

For his part, Thomas emphasizes that Sherry testified that Saldana had made a prior threat about Thomas to her, saying "he was going to kick [Thomas'] black ass."

18

Additionally, Thomas points to a disparaging statement that Saldana communicated to Sherry, which included a derogatory reference to Thomas' race. Sherry apparently passed these statements along to Thomas. Additionally, Thomas told Detective Paden that he knew Saldana was "a violent man" who carried weapons, that he was concerned for his safety, and that he shot Saldana when he "kept coming at him."

We question the district court's legal conclusion that Thomas had a subjective belief that deadly force was necessary under the circumstances. First, the district court based its legal conclusion on the single fact that Thomas put on a protective vest when he heard that Saldana was coming to the Reynolds' residence. We find this action is ambiguous and susceptible to several interpretations other than an expression of Thomas' subjective belief that Saldana posed a threat of imminent death or great bodily harm on that occasion.

While, as Thomas points out on appeal, there was other evidence that tended to show Saldana may have had ill will toward Thomas, or had told Sherry that he was going to strike Thomas on a prior occasion, or that Sherry testified that Saldana was "charging" Thomas prior to the shooting, we have no indication from the district court that any of these facts were true and, if so, whether they played any role in the district court's evaluation of Thomas' subjective belief. Moreover, as detailed in the previous section, there were numerous other facts presented which, depending on their truth, impacted the analysis of Thomas' subjective intent. Once again, we are left to speculate whether these facts influenced the district court's legal conclusion.

In short, we find there was substantial competent and undisputed evidence that Thomas put on a protective vest a short time prior to Saldana's arrival. However, this evidence, standing alone, was not sufficient to support the district court's ultimate legal conclusion that Thomas had a reasonable subjective belief that his use of a deadly

19

weapon in shooting and killing Saldana was necessary to prevent imminent death or great bodily harm.

As to the objective standard of whether a reasonable person in the same situation would have perceived the need to use deadly force, in the district court Thomas argued that the "situation posed a serious threat to Mr. Thomas and [Sherry] and . . . the use of force would be justified to extinguish that threat." In particular, Thomas asserted:

> "Mr. Thomas attempted to not use excessive force in the current case when he brandished his weapon, but the victim still kept coming at Mr. Thomas. The allegation . . . that Mr. Thomas *fired one shot prior to actually shooting the victim* shows that Mr. Thomas attempted to use a reasonable show of force prior to using deadly force. This one shot was necessary to attempt to stop the threat of danger and physical injuries to Mr. Thomas, and possibly to [Sherry]." (Emphasis added.)

In response, in the district court the State primarily focused on two arguments. First, the State argued there was no need for Thomas to exert force against Saldana because "[t]here was no indication that Saldana ever posed any real threat to [Thomas]." Indeed, citing K.S.A. 2015 Supp. 21-5221(b), and assuming that an unarmed Saldana posed a threat, the State pointed out that "[a]n individual is only justified in using deadly force . . . 'if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.'" According to the State, no such deadly force situation was presented under the circumstances. Second, the State argued in the alternative that if an altercation occurred at the time of the shooting it was because Thomas was the initial aggressor or that both men were engaged in mutual combat for which self-defense was not applicable under K.S.A. 2015 Supp. 21-5226 and *McCullough*, 293 Kan. at 975-76.

With regard to the second prong of the reasonableness test, the district court also found Thomas' use of deadly force against Saldana was objectively reasonable. Once

20

again, the district court arrived at this conclusion of law based on one factor—the testimony of Detective Paden.

During cross-examination by defense counsel, Detective Paden was asked, "Would it be . . . objectively unreasonable at that point if somebody was coming at you to pull your weapon and fire it?" The detective responded, "Depending on the circumstances. There's a lot of things you have to take into consideration. The size of the person, their demeanor. It just kind of depends. I couldn't say one way or another for sure what one officer might find life threatening and another one might not."

During redirect examination, the prosecutor followed up on this testimony with Detective Paden, and the following colloquy occurred:

> "Q.  [MR. MATHEWS:] . . . [T]aking into consideration what you have already spoken about regarding training and experience, what does your training tell you about the employment of deadly force against somebody who is perhaps just using force?
>
> "A.  [DETECTIVE PADEN:] Like I said, you have to take the whole situation at hand. I don't know that drawing his weapon was a wrong act. The information that he had had before with the fact that Saldana was a violent man, always carried a weapon, you have to take that into consideration. I don't know that him drawing the weapon was a wrong act."
>
> "Q.  [MR. MATHEWS:] What about firing the weapon?
>
> "A.  [DETECTIVE PADEN:] That I said that was kind of have to be—I would have to be there in that situation to determine whether I would fire or not."

In finding that Thomas' shooting of Saldana was objectively reasonable, the district court relied exclusively on Detective Paden's testimony:

> "[Detective] David Paden's testimony on direct examination by the State's attorney said he was of the opinion that, at the time, [Thomas] was justified in drawing his weapon.

21

That was his direct testimony. If you're justified in drawing your weapon, that's an objective test. That's what the [detective]—that's what a [detective] thought, the [detective] that investigated the case. Well, if he's justified in drawing his weapon, an objective person would think that he's justified in firing it, because if you're justified in drawing it, you're justified in using it."

There are several problems with the district court's analysis of the objective component of Thomas' belief in the need to use deadly force. In cross-examination, Detective Paden testified that he could not say whether it would be objectively reasonable for a particular *law enforcement officer* to draw and shoot his firearm because "[t]here's a lot of things you have to take into consideration" under the particular circumstances. With regard to the detective's response, it is apparent that his answer related specifically to a law enforcement officer's view of what is "life threatening," and the officer's use of a deadly weapon in the course of his employment. We know of no legal authority that equates a law enforcement officer's view under these circumstances with a reasonable person's objective view. Regardless, Detective Paden said he was unable to opine regarding this question.

In response to redirect examination, Detective Paden testified on two occasions in one response, "I don't know that *drawing* [Thomas'] weapon was a wrong act." (Emphasis added.) First, whether the displaying of a deadly weapon by Thomas under the circumstances was a right or wrong act is not an element of the objectively reasonable standard. Second, as before, the detective testified that he did not have knowledge sufficient to answer the question about Thomas displaying the firearm during the encounter.

In the third testimonial instance, Detective Paden did not express an opinion regarding whether he would *shoot* an individual under particular circumstances, noting that he would have to personally experience that situation before making a determination

22

as to whether it was appropriate. Moreover, the relevance of this testimony in assessing the second prong of the reasonableness test is unclear.

Upon our review of the entirety of Detective Paden's testimony, we find first, there was no basis for the district court's conclusion that the detective believed it was objectively reasonable for Thomas to draw or fire his weapon during the encounter with Saldana. Second, we do not find any legal authority that provides that a law enforcement officer's opinion regarding use of deadly force necessarily constitutes a reasonable person's objective view.

Third, we find no legal basis for the district court's conclusion of law that if an individual is justified in drawing a deadly weapon that individual is justified in firing it. We are aware, however, of law that indicates otherwise. Kansas courts have found "the self-defense statutes permit a person to defend himself or herself by drawing a handgun and pointing it in a threatening manner even to resist nonlethal force." *State v. Sanders*, No. 103,171, 2011 WL 3276191, at *5 (Kan. App. 2011) (unpublished opinion). However, it does not follow that a person facing the threat of nonlethal force may defend himself with lethal force simply because he drew a weapon. See 2 LaFave, Substantive Criminal Law § 10.4(a) ("But merely to threaten death or serious bodily harm, without any intention to carry out the threat, is not to use deadly force, so that one may be justified in pointing a gun at his attacker when he would not be justified in pulling the trigger.").

Fourth, by solely focusing on Detective Paden's testimony, the district court disregarded our Supreme Court's admonition that the objective prong should be determined "in light of the totality of the circumstances." *Walters*, 284 Kan. at 16. The district court's sole reliance on Detective Paden's testimony in support of the district court's legal conclusion ignored the many important circumstances surrounding the death of Saldana.

23

In summary, we conclude there was not sufficient competent evidence to support the district court's conclusion of law that a reasonable person in Thomas' circumstances would have perceived the use of deadly force in self-defense as necessary. Moreover, the district court erred in concluding that Kansas law provides that a person who rightfully draws a deadly weapon may necessarily fire that weapon in lawful self-defense. In short, the district court erroneously found Thomas' use of deadly force was objectively reasonable.

As discussed in this opinion, we hold the district court erred in failing to make findings of fact in support of its legal conclusions. We also hold the district court erred in making its conclusions of law. Accordingly, we reverse the grant of immunity and dismissal of the charge and remand with directions to conduct a rehearing on the motion, and upon consideration of the evidence presented at the rehearing, to make findings of fact and conclusions of law on all matters necessary to rule on the self-defense and immunity issues.

In order to implement our court's judgment, we take judicial notice of the fact that Judge Ron Svaty, the district judge who conducted the evidentiary hearing and ruled on this matter, retired on October 1, 2017. See K.S.A. 60-409(a) (stating facts which may be proven by judicial notice). As a result, we are unable to direct that the district judge who conducted the motion hearing simply reconsider the facts and law and inform us of the appropriate findings and conclusions. Under these unique circumstances, and given the fact-intensive inquiry of self-defense immunity motions, and the importance of credibility determinations in fact-finding, the district judge assigned this case shall conduct another evidentiary hearing on Thomas' motion, and make the requisite findings of fact and conclusions of law.

At this evidentiary hearing the district court must consider the totality of the circumstances, weighing the evidence before it without deference to the State, and

24

determine whether the State has met its burden to establish probable cause to believe that Thomas initially provoked the use of force against Saldana, as described in K.S.A. 2016 Supp. 21-5226(b) and (c), which would render both the justification and immunity defenses unavailable to Thomas. If the district court finds that Thomas did not initially provoke the use of force, the court must consider the totality of the circumstances, weighing the evidence before it without deference to the State, and determine whether the State has met its burden to establish probable cause to believe that Thomas' use of deadly force was not statutorily justified because Thomas did not have a sincere and honest belief that it was necessary to use deadly force and/or that a reasonable person in Thomas' situation would not have perceived the use of deadly force was necessary as required by K.S.A. 2016 Supp. 21-5222.

Reversed and remanded with directions.